## DAVIS v. ELMIRA SAVINGS BANK.

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

No. 415.   Argued January 13, 14, 1896. — Decided March 2, 1896.

Section 130 of chapter 689 of the laws of New York of 1892, providing for the payment by the receiver of an insolvent bank, in the first place, of deposits in the bank by savings banks, when applied to an insolvent national bank, is in conflict with § 5236 of the Revised Statutes of the United States, directing the Comptroller of the Currency to make ratable dividends of the money paid over to him by such receiver, on all claims proved to his satisfaction, or adjudicated in a court of competent jurisdiction, and is therefore void when attempted to be applied to a national bank.

In March, 1893, the Elmira National Bank, a banking association organized under the laws of the United States, and doing business in the State of New York, suspended payment, and the Comptroller of the Currency of the United States appointed Charles Davis, plaintiff in error, the receiver thereof. The Elmira Savings Bank, which was incorporated under the laws of the State of New York, from November, 1890, kept a deposit account with the Elmira National Bank, and at the time of the appointment of the receiver of the latter corporation there was to the credit of this account of the Savings Bank the sum of $42,704.67. The opening of the deposit account by the Savings Bank was sanctioned by the general banking laws of the State of New York, as expressed in sections 118 and 119 of chapter 689 of the laws of 1892, which were as follows:

2 Laws of 1892, p. 1898, c. 689. "§ 118. AVAILABLE FUND FOR CURRENT EXPENSES, HOW LOANED. — The trustees of every such corporation shall as soon as practicable invest the moneys deposited with them in the securities authorized by this article; but for the purpose of meeting current payments and expenses in excess of the receipts, there may be kept an available fund not exceeding ten per centum of the whole amount of deposits with such corporation, on hand or deposit in any bank in this State organized under any law of this State or of the United States, or with any trust company incorporated by any law of the State; but the sum so deposited in any one bank or trust company shall not exceed twenty-five per centum of the paid-up capital and surplus of any such bank or company. . . ."

*Ib.* "§ 119. TEMPORARY DEPOSITS. — Every such corporation may also deposit temporarily in the banks or trust companies specified in the last section the excess of current daily receipts over the payments, until such time as the same can be judiciously invested in the securities required by this article. . . ."

In the process of liquidating the affairs and realizing the assets of the National Bank all its circulating notes were provided for, and the receiver had on hand in cash for distribution among its creditors a sum exceeding the amount due as afore-

said to the Savings Bank. Thereupon the latter demanded of the receiver payment of the sum to the credit of its deposit account in preference to the other creditors of the National Bank, basing its demand on a provision of the general banking law of the State of New York, which is as follows:

*Ib.* 1903. "§ 130. DEBTS DUE SAVINGS BANKS FROM INSOLVENT BANKS PREFERRED. — All the property of any bank or trust company which shall become insolvent shall, after providing for the payment of its circulating notes, if it has any, be applied by the trustees, assignees or receiver thereof, in the first place, to the payment in full of any sum or sums of money deposited therewith by any savings bank, but not to an amount exceeding that authorized to be so deposited by the provisions of this chapter, and subject to any other preference provided for in the charter of any such trust company."

The receiver, under the authority of the Comptroller of the Currency of the United States, declined to accede to this demand, predicating his refusal on the provisions of sections 5236 and 5242 of the Revised Statutes of the United States, which are as follows:

"§ 5236. From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the Comptroller shall make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held."

"§ 5242. All transfers of the notes, bonds, bills of exchange or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees

in its favor; all deposits of money, bullion or other valuable thing for its use or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void. . . ."

In consequence of this refusal the Savings Bank brought an action in the Supreme Court of the State of New York to enforce the payment by preference, which action was resisted by the receiver. Ultimately the case was taken to the Court of Appeals of the State of New York, where the claim of preference, asserted by the Savings Bank, was maintained. The case is reported in 142 N. Y. 590. To that judgment the present writ of error is prosecuted.

*Mr. Edward Winslow Paige* for plaintiff in error.

*Mr. Augustus S. Hutchins* filed a brief on behalf of the Metropolitan Savings Bank.

*Mr. James C. Carter* and *Mr. Edward G. Herendeen* for defendant in error.

The Court of Appeals of New York held in this case that the New York statute applies to national as well as to state banks. This construction is, of course, binding on this court. *Christy* v. *Pridgeon*, 4 Wall. 196; *People* v. *Weaver*, 100 U. S. 539.

Clearly the legislature intended that national banks should be on the same footing as state banks as to right to receive deposits of savings banks. But this intention would wholly fail of purpose, if such deposits were preferred when held by insolvent state banks and were not preferred when held by insolvent national banks.

That act is within the proper sphere of state legislation. The theory upon which the constitutionality of national bank

legislation was finally upheld, is a narrow one, necessarily involving sharp and closely confined limitations. Of the cases on this subject, the leading one is *National Bank* v. *Commonwealth*, 9 Wall. 353. From the opinion in that case, the United States Supreme Court, in so recent a case as *Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530, 551, referring to such limitation, quotes approvingly as follows: "That limitation is that the agencies of the Federal government are only exempted from state legislation, so far as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone on the necessity of securing to the government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the States. . . . So of the banks. They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. *It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.*" See also *Waite* v. *Dowley*, 94 U. S. 527.

The contract which the state statute compelled the bank to make with the defendant in error in this case is one made in respect to an ordinary transaction between the bank and a depositor. Such a contract in no respect impairs the utility of the national bank as an agent of the United States, and is to be considered as made with reference to the law of the State, and as subject to its provisions. *Odgen* v. *Saunders*, 12 Wheat. 213; *Baldwin* v. *Hale*, 1 Wall. 223; *Von Hoffman* v. *Quincy*, 4 Wall. 535, 550. The highest court of the State has decided that it gave to the defendant in error an equitable lien which operated as an equitable assignment of the assets of the national bank upon insolvency for the purpose of securing the payment of the deposit in full, and that construc-

tion is binding on this court. *Louisiana* v. *Pillsbury*, 105 U. S. 278; *Morley* v. *Lake Shore & Michigan Southern Railway*, 146 U. S. 162, 166.

It is not material that the fund so assigned should be in existence. *Peugh* v. *Porter*, 112 U. S. 737, 742. According to the general doctrine of equity, established beyond any doubt by the highest judicial authority, the equitable assignment or the equitable lien upon property to be acquired in the future, is valid and enforceable not only against the contracting party himself, but also against subsequent judgment creditors, assignees in bankruptcy, and all other *volunteers* claiming or holding under him and against subsequent purchasers from him with notice of the assignment or lien. When chattels are sold or exchanged, the lien will attach to those substituted. 3 Pom. Eq. Jur. § 1291.

Assignees in bankruptcy take only such rights as the bankrupt had, and are affected with all the equities which would affect the bankrupt himself. Courts of equity support assignments of choses in action, interests and expectations not only, but also of things which have no present actual potential existence but rest in mere possibility only.

An agreement to charge, or to assign, or to give security upon, or to affect property not yet in existence, or in the ownership of the party making the contract, or property to be acquired by him in the future . . . constitutes an equitable lien upon the property so existing or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specific things existing and owned by the contracting party at the date of contract. 3 Pom. Eq. Jur. §§ 1236, 1237.

This equitable assignment only differs from a pledge in that the fund is not yet definitely fixed. Such a pledge or mortgage is permitted when made for present consideration, though it may operate to give a preference. So the *present assignment* of a fund to be thereafter definitely ascertained, must be permitted, though it operate as a preference.

This constitutes a present right of property which the legislature cannot constitutionally impair. *Mather* v. *Bush*, 16

Johns. 233, 252; *Roosevelt* v. *Cebra*, 17 Johns. 108; *Sturges* v. *Crowninshield*, 4 Wheat. 122, 198.

Any statute is unconstitutional as impairing the obligation of contracts which introduces a change into the express terms of the contract, its legal construction, its validity, its discharge, or (within certain limits) its enforcement.

The prohibition of the Constitution against state laws impairing the obligation of contracts, applies to implied as well as to express contracts. *Fisk* v. *Jefferson Police Jury*, 116 U. S. 131.

In any case the lawful repeal of a statute cannot constitutionally be made so as to destroy contracts which have been entered into under it, or to affect substantially the rights obtained by virtue of the statute. Cooley's Const. Lim., 3d ed., pp. 289, 290, 291, and 292.

The right of the Savings Bank to deposit in the National Bank only existed by permission of the statute. That permission is conditioned on an equitable assignment, as collateral security for the deposit, of the assets of the National Bank on hand at the time of its insolvency.

The contract made by the operation of the state statute between the Savings Bank and the National Bank at the time the deposit was made, constituting an equitable lien or equitable assignment, is not in conflict with the national bank act, or with any provision of any Federal statute. The Federal statute has been construed to recognize all prior equitable and legal liens. *Scott* v. *Armstrong*, 146 U. S. 499.

It has been uniformly held that the receiver is a statutory assignee of the bank, and gets no better title than the bank had, and takes the funds in the plight in which they were held by the bank immediately prior to his appointment, and must turn them over accordingly unaffected by the provisions of the national bank act, as to ratable distribution. He takes the property *cum onere*.

In *Scott* v. *Armstrong*, this court held that the receiver of a national bank took the assets as a mere trustee and not as a purchaser for value; and that in the absence of a statute to the contrary, demands and choses in action which belonged to

the bank were in his hands subject to all claims and advances that might have been interposed as against the bank before the liens of the United States and general creditors attached.

Even under the stringent provisions of non-preferential bankrupt laws, it has been uniformly held that collateral given at the time of the passing of a present sufficient consideration, even though the possibility, or even probability, of future insolvency was in the minds of the parties at the time, will be sustained, and contractual rights or equities existing at such a time will be afterward upheld when insolvency occurs.

The contract in question was not made in contemplation of insolvency. The lien created by it was not a secret lien. It worked no harm to other depositors. Without it the bank could not have obtained the deposit. The National Bank might have refused to accept the deposit under these terms, but the Savings Bank had no discretion. It could only deposit upon the conditions of this statutory contract. The use of that deposit was to the advantage of all of the depositors of the depository bank. The assets of the bank were thus increased by every dollar for which the lien is claimed, and no harm could possibly result by this transaction to the other creditors of the bank.

It is no answer to the contention of the defendant in error in this case to say that such a contract could be made with every one and proportionate distribution thereby defeated. We are dealing with a right given by the State of New York to one class of creditors only; a right founded in the highest conception of public policy, and in line with the theory of all savings bank legislation, which is to surround the funds of savings banks with every possible protection. The Savings Bank is limited in its powers. It is not permitted to make any other contract of deposit with the National Bank. If this case should be held to be an exception to a general rule it would work no harm, for it would be an exception founded upon the broad principles of public policy and justice.

Mr. Justice White, after stating the case, delivered the opinion of the court.

National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt, by a State, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court.

The question which the record presents is, does the law of the State of New York on which the Savings Bank relies conflict with the law of the United States upon which the Comptroller of the Currency rests to sustain his refusal? If there be no conflict, the two laws can coexist and be harmoniously enforced, but if the conflict arises, the law of New York is from the nature of things inoperative and void as against the dominant authority of the Federal statute. In examining the question it is well to put in juxtaposition a summary statement of the Federal and state statutes. The first directs the Comptroller "from time to time, after full provision has been made for the refunding to the United States of any deficiency in redeeming the notes of such association, . . . to make a ratable dividend of the money paid over to him . . . on all such claims as may have been proved." The second, the state law, directs "the trustee, assignee or receiver" of "any bank or trust company which shall become insolvent" to apply the assets received by him, "in the first place to the payment in full of any sum or sums of money deposited therewith by any savings bank, but not to an amount exceeding that authorized" by law.

It is clear that these two statutes cover exactly the same subject-matter. Both relate to insolvent banks; both ordain

that the right of preference on the one side and the duty of ratable distribution on the other shall only result from insolvency; both cover the assets of such banks coming, after insolvency, into the hands of the officer or person authorized to administer them.   It is equally certain that both statutes relate to the same duty on the part of the officer of the insolvent bank; the one directs the representative to make a ratable distribution; the other requires, if necessary, the application of the entire assets to payment in full, by preference and priority over all others of a particular and selected class of creditors therein named.   We have, therefore, on the one hand, the statute of the United States, directing that the assets of an insolvent national bank shall be distributed by the Comptroller of the Currency in the manner therein pointed out, that is, ratably among the creditors.   We have on the other hand, the statute of the State of New York giving a contrary command.   To hold that the state statute is operative is to decide that it overrides the plain text of the act of Congress. This results, not only from the fact that the two statutes, as we have said, cover the same subject-matter, and relate to the same duty, but also because there is an absolute repugnancy between their provisions, that is, between the ratable distribution, commanded by Congress, and the preferential distribution directed by the law of the State of New York.

The conflict between the spirit and purpose of the two statutes is as pronounced as that which exists between their unambiguous letter.   It cannot be doubted that one of the objects of the national bank system was to secure, in the event of insolvency, a just and equal distribution of the assets of national banks among all unsecured creditors, and to prevent such banks from creating preferences in contemplation of insolvency.   This public aim in favor of all the citizens of every State of the Union is manifested by the entire context of the national bank act.

In *Cook County National Bank* v. *United States*, 107 U. S. 445, 448, speaking through Mr. Justice Field, the court said: "We consider that act as constituting by itself a complete system for the establishment and government of national

banks. . . . Everything essential to the formation of the banks, the issue, security and redemption of their notes, the winding up of the institutions, and the distribution of their assets, are fully provided for."

In *National Bank* v. *Colby,* 21 Wall. 609, 613, 614, the court said:

"As to the general creditors, the act evidently intends to secure equality among them in the division of the proceeds of the property of the bank. . . .

"The fifty-second section, further to secure this equality, declares that all transfers by an insolvent bank of its property of every kind, and all payments of money made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by the act, or ' with the view to the preference of one creditor over another, except in the payment of its circulating notes,' shall be utterly null and void.

"There is in these provisions a clear manifestation of a design on the part of Congress: 1st, to secure the government for the payment of the notes, not only by requiring, in advance of their issue, a deposit of bonds of the United States, and by giving to the government a first lien for any deficiency that may arise on all the assets subsequently acquired by the insolvent bank; and, 2d, to secure the assets of the bank for ratable distribution among its general creditors.

"This design would be defeated if a preference in the application of the assets could be obtained by adversary proceedings."

Nearly twenty-five years ago (in September, 1871) the Secretary of the Treasury submitted to the Attorney General of the United States the question of whether the ratable division provided for in the act of Congress deprived the United States, as a creditor of an insolvent national bank, of the power to avail of the preference given by the statute, which provides that the United States shall be preferred out of the effects of an insolvent debtor. (Act of March 3, 1797, c. 20, § 5, 1 Stat. 515.) The opinion of the Attorney General was that the ratable distribution required, when read in connection with other

sections of the national bank law, deprived the United States of all preference, except that given for the payment of the notes issued by such banks. 13 Opinions, 528.

This construction has been the rule administered by the Comptrollers of the Currency in the liquidation of national banks, from that date, and was directly sustained in *Cook County National Bank* v. *United States, ubi supra,* where Mr. Justice Field, as the organ of the court, said : " The sections directing ratable distribution provide for the distribution of the entire assets of the bank, giving no preference to any claim, except for moneys to reimburse the United States for advances in redeeming the notes." After holding that the United States could not exercise as a creditor the preference in its favor created by a general law of the United States, the conclusion is thus summed up : " These provisions could not be carried out if the United States were entitled to priority in the payment of a demand not arising from advances to redeem the circulating notes. The balance, after reimbursement of the advances, could not be distributed as directed by ratable dividends to all holders of claims, that is, to all creditors." Thus, although for many years in the administration of the act, under a construction given by the Attorney General of the United States, sanctioned by the decisions of this court, the ratable distribution provided by the act of Congress has been deemed so important as to repeal, in so far as it prevented ratable distribution, the general preference given the United States by its own statute, the contention now advanced maintains that this ratable distribution is of so little consequence that it can be overthrown and rendered nothing worth, by the provisions of a general insolvent statute of the State of New York. In other words, that the statute of the State of New York operating upon the national bank law is more efficacious than would be a statute of the United States.

Nor is it an answer to say that the *ratio decidendi* of the ruling in *Cook County National Bank* v. *United States* was the fact that the statute provided that the United States should take security for the debts to become due them by a national bank. In the case presented by the Secretary of the

Treasury to the Attorney General for consideration the security in favor of the United States was inadequate, and therefore the question which arose was the right of the United States to collect an unsecured claim in disregard of the rule of ratable division. And such was the state of facts contemplated by the opinion of this court in the *Cook County case*. This makes it evident that the controlling thought which gave rise to the interpretation sanctioned by this court was the fact that to have allowed the preference in favor of the United States ordained by one of its statutes would have destroyed the rule of ratable distribution established as a protection to and for the benefit of all the creditors of a national bank.

It is certain, that in so far as not repugnant to acts of Congress, the contracts and dealings of national banks are left subject to the state law, and upon this undoubted premise, which nothing in this opinion gainsays, the proposition is advanced that the deposit here considered of the Savings Bank with a national bank imported a contract to pay the claim of the former with the preference allowed by the New York statute. But this overlooks the plain terms of the New York law. That statute does not profess to deal with the bank and its relations as a going concern; it wholly and exclusively undertakes to regulate the distribution of the assets after insolvency. Insolvency, and insolvency alone, is made the criterion from which the preference is to arise. Indeed, the statute, in terms, directs its mandate to discharge the claim with preference, not to the bank *eo nomine*, but to the assignee, trustee or agent, charged with administering its effects after insolvency has become flagrant. The claim of contract, therefore, conflicts with the very terms of the statute upon which it is based, and there is, therefore, no room for implying a contract. If such implication, however, could be invoked it must rest on the contention that inasmuch as the state statute gave a savings bank making a deposit the right to be preferred in case of insolvency, therefore the general state law must be presumed to have entered into the contract of the parties, and hence also engender the presumption that

in case of insolvency such deposit should be preferred. If the law of the State is to be read into the contract, then, of course, the law of Congress should also be read into it. We should thus have to consider all the deposits as made with an implication that they were subject to the Federal law, and hence the conflict between the two laws would become evident, and the Federal law, being paramount, would prevail.

The New York statute does not profess, however, to change the legal relation which results from a deposit made in a bank. The deposit of money by a customer with his banker is one of loan, with a superadded obligation that the money is to be paid when demanded by a check. *Scammon* v. *Kimball*, 92 U. S. 362; *Marine Bank* v. *Fulton Bank*, 2 Wall. 252. The argument, therefore, of implied contract, not only is contrary to the letter of the New York statute, but also destroys the very essence of the legal relation resulting from the dealings between the parties. Nor is the repugnancy between the state statute and the act of Congress removed by the contention that inasmuch as ratable distribution applies only to that which belongs to the bank, therefore there is no conflict between the state statute and the act of Congress. This argument can only mean that the effect of the state statute is to make the Savings Bank, in the event of insolvency of the National Bank, the owner of a sum equivalent in amount to the sum of money which was by it deposited. But to say this aggravates the conflict between the state law and the act of Congress. If the state statute is to be read as saying that whenever the persons named therein deposit money with a national bank they shall be treated as the owners of an equal sum of the assets of the bank when it becomes insolvent, then the state statute precludes, in a most flagrant way, the possibility of the ratable distribution ordered by the act of Congress. True it is that where, by state law, a lien is made to result from a particular contract, that lien, when its existence is not incompatible with the act of Congress, will be enforced. True, also, where a particular contract is made by a national bank which from its nature gives rise at the time of the contract to a claim on a specific fund, such claim, if not violative

of the act of Congress will be allowed.   To that effect are the authorities relied on.

Thus it was said by this court in *Scott* v. *Armstrong*, 146 U. S. 499, when dealing with the question of set-off: "The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor, does not belong to the bank." So in the case of *San Diego County* v. *California Nat. Bank*, 52 Fed. Rep. 59, it was decided that the funds received by a national bank, which the party depositing had no authority of law to deposit, were not part of the assets to be "ratably distributed," but must be returned in full to the rightful owner.   And, again in *Massey* v. *Fisher*, 62 Fed. Rep. 958, which was a case where an endorser paid the amount of a note to a bank and took a receipt, but before he took the note from the bank the bank failed, the substance of the decision was, that the money did not belong to the bank, but was held by it in trust; and, of course, in that case, it was not part of its assets.

None of these cases are apposite here.   On the contrary, by an affirmative, pregnant with a negative, they deny the preference which is now advanced.   This clearly results from the context of the opinions in these cases.   They all reason to demonstrate that from the particular facts stated the relation was not that of an ordinary creditor, but was one giving rise to a specific lien or right resulting from the contract, and which was in being before the insolvency took place.   Here there is no such condition; there is simply an ordinary creditor asserting the right to a preference arising from an insolvent law.   This distinction is well illustrated by *Scott* v. *Armstrong*, *supra*, cited and relied on in the opinion of the court below.   In that case the facts as to the set-off, which was allowed, are thus stated: "The credits between the banks were reciprocal and were parts of the same transaction, in which each gave credit to the other on the faith of the simultaneous credit, and the principle applicable to mutual credits applied."

The difference between *Scott* v. *Armstrong* and the pres-

ent case is this: There this court was called on to determine whether a claim which had been extinguished, by operation of law, prior to the insolvency was still due after the insolvency, but here the question is whether a claim existing at the time of the insolvency and up to that date unsecured shall, by the operation of an insolvent statute, be converted after the insolvency into a preferred claim to be paid by preference over all other creditors.　This distinction between the two questions was clearly stated in *Scott* v. *Armstrong*, where, speaking through Mr. Chief Justice Fuller, this court said: " The state of case where the claim sought to be off-set is acquired after the act of insolvency, is far otherwise for the rights of the parties become fixed as of that time, and to sustain such a transfer would defeat the objects of these provisions (the act of Congress).　The transaction must necessarily be held to have been entered into with the intention to produce its natural result, the preventing of the application of the insolvent assets in the manner prescribed.　*Venango National Bank* v. *Taylor*, 56 Penn. St. 14; *Colt* v. *Brown*, 12 Gray, 233."

Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation.　Much was said in argument as to the public policy embodied in the law of the State of New York and the wisdom of upholding it.　Our function is judicial and not legislative.　Did we, however, consider motives of public policy, we should not be unmindful of the wise safeguard, in favor of all the people of the United States, resulting from the provision which secures to every one dealing with a national bank a ratable distribution of the assets thereof, thereby stimulating confidence and uniformity of treatment.

*Judgment reversed and case remanded to the Court of Appeals of the State of New York with instructions to remit the cause to the court in which it originated with directions to dismiss the action.*