Argued May 12; affirmed June 15; rehearing denied
September 14, 1937

# BANK OF CALIFORNIA ET AL. *v.* CITY OF PORTLAND ET AL.

(69 P. (2d) 273)

*Frank S. Grant*, City Attorney, and *Alexander G. Brown*, Deputy City Attorney, both of Portland, for appellants.

*Robert Treat Platt*, of Portland (Thomas G. Greene, Pendergrass & Zollinger, and Edward T. Cram, all of Portland, on the brief), for respondents.

BEAN, C. J.  The city contends that the rental of safe deposit vaults is not a function or power of a national bank as an agency of the United States government, as such powers and functions are set forth in the National Bank Act and the Federal Reserve Act and amendments thereto, nor is the rental of safe deposit vaults a necessary or integral part of the general banking business carried on by the respondent banks.

Plaintiffs contend that the city ordinance imposing the license fee has no application to national banks and that the officers and agents of the city of Portland have no power to enforce collection of such tax as against said banks.  Plaintiff banks charge and collect a rental for the use of the safe deposit vaults.  The rental by plaintiffs of each compartment of the safe deposit vaults is not dependent or conditioned upon the applicant being a patron or engaged in any banking transaction with the bank.

The sole legal question, therefore, is whether or not the business of operating a safe deposit vault is within the lawful purview of the acts creating and limiting the scope of national banking associations and is an integral part of the banking business.  Counsel

for defendants candidly state that if operating a safe deposit vault is an integral part of the banking business, then the ordinance is void.

■ The right of Congress to create a corporation for the business of banking as a fiscal agent of the government is one of the implied powers under the constitution: 14 C. J. 97, § 64; 3 Enc. of U. S. Sup. Ct. Rep. 12.

Plaintiffs submit that the operation of safe deposit vaults is an integral part of the business of banking, by analogy to the receiving of special deposits, the latter being well recognized as an integral part of the banking business: *Foster v. Essex Bank*, 17 Mass. 479 (9 Am. Dec. 168); *Pattison v. Syracuse Nat. Bank,* 80 N. Y. 82 (36 Am. Rep. 582); *First Nat. Bank v. Graham,* 100 U. S. 699 (25 L. Ed. 750); *Rodgers v. First Nat. Bank* (Texas), 68 S. W. (2d) 371.

At the threshold of the whole case, we are met with the statement that no case has been adjudicated which is exactly in point, and our attention called to cases which are analogous.

■ In both the safe deposit and special deposit business, the relation is that of bailor-bailee and not debtor-creditor: *Rodgers v. First Nat. Bank,* supra; 67 C. J. 595, et seq.

■ We read in 1 Morse on Banks and Banking (6th Ed.), § 212 A: "A bank renting safety-deposit boxes to customers holds the contents thereof as bailee, and not as trustee." In section 47 of that volume, we read, in substance, that the business powers of a bank are either express or implied, and are conveniently divided into, first, primary or principal, or banking powers, for the exercise of which it is created, and, second, incidental powers, or such as are necessary or usual and convenient for the attainment of the purposes of its

creation. It is necessary to confer in distinct terms in the charter or act of incorporation only those powers which the company could not otherwise exercise, or those concerning which there might be some doubt. Various powers have been at different times declared by the courts to be inherent, and to be properly enjoyed by banking associations simply by virtue of their creation and existence as such, and for the designated end of conducting the banking business. But powers of this nature, being based only upon a legal implication, must be used only in a manner and for purposes strictly consistent with such restrictions, and in furtherance of such duties as are specifically prescribed by law. To ascertain what is legitimately within the scope of the business of banking, it is proper to refer to the history of banking and the definitions of lexicographers. As the business of bankers is part of the law merchant, courts judicially notice the universal custom of bankers. The heart of the law of banking is that a bank has such powers as are requisite for the safe and convenient attainment of the purposes of its incorporation.

■ Section 48, of the same volume, says, in effect, that the banking powers are those which are either fundamental parts of the business or have become so linked with them as to be identified with the exercise of the banking franchises. The United States statutes constitute the measure of the authority of national banks, and they cannot rightfully exercise any powers except those expressly granted, or which are incidental to carrying on the business for which they are established.

It is interesting to note that when the power of banks, and national banks in particular, to receive special deposits of valuables, was first challenged in this country, the same arguments were advanced that are

relied upon by defendants. It was declared, then as now, that the receiving of these deposits created a bailor-bailee relation between the depositor and the bank, and was no part of the banking business, and consequently such acts were ultra vires.

The following able decisions, rendered by courts of high standing, contain discussions of the history of special deposits and an analysis upon which those courts concluded that the receiving of special deposits was and is an integral part of the banking business: *Foster v. Essex Bank,* supra; *Pattison v. Syracuse Nat. Bank,* supra; *First Nat. Bank v. Graham,* supra. In the Pattison case we are told by counsel for defendant that banks were without corporate power to receive special deposits of valuables for safe-keeping, and that the receipt of deposits of that character was wholly outside of and foreign to the business of banking. We quote from the opinion written by Mr. Justice Rapallo, as follows:

"A reference to the history of banking discloses that the chief, and in some cases the only, deposits received by the early banks, were special deposits of money, bullion, plate, etc., for safe-keeping, to be specifically returned to the depositor; that such was the character of the business done by the Bank of Venice (the earliest bank) and the old Bank of Amsterdam, and that the same business was done by the Goldsmiths of London and the Bank of England, and we know of none of the earlier banks where it was not done. * * * The numerous cases in the books relating to special deposits in banks, disclose how extensively, even in modern times, this business has been and is carried on, and the general understanding in respect to it. The very act of Congress under which the national banks are organized recognizes the practice, and provides for the return of special deposits by national banks, even when required to suspend their general business. Section 46

of the act of 1864 provides that, in certain events, the banks shall cease to prosecute business, 'except to receive and safely keep money belonging to them, and to deliver special deposits'. This provision assumes that such banks will receive special deposits, and impliedly recognizes and sanctions their so doing, by making express provision enabling them to return them at a time when they are prohibited from paying out to depositors funds held on general deposit."

Attention is called to "Banking Through the Ages" by Noble Foster Hoggson. It deals with banking from the dawn of history to the Napoleonic era. We quote from chapter 2, page 34, on the subject, "Sacred Safe Deposit Vaults of Ancient Greece":

"From Greece, however, came the real inspiration for the safe deposit department as we know it today. Unlike Egypt and Babylonia, both blessed with strong central governments, Greece was divided into many practically independent states and cities which were usually at war with one another or with foreign powers. When not at war they were in a constant state of unrest through the activities of opposiing political factions.

"By sad experience, or perhaps by happy accident, the Greeks discovered in the Temple the only safe depository which the turbulent times afforded, and which usually remained inviolate. The strong religious principles of the educated classes, as well as the superstitions and fears of the unscrupulous and non-believers, combined to create about the Temple an atmosphere of greater security than could have been attained by any mechanical devices then known.

"To the Temples of Greece, therefore, one may look for the first real safe deposit vaults as well as for the beginnings of the functions of our banks of domestic and foreign commerce. On behalf of timid or absent owners, the priests of the Temple received money, precious stones, silver and gold plate, jewelry, important documents, and practically every other form of valuables.

"For the safeguarding of treasure there were at first no standard charges made by the Temple banks, but records show that the obliging priests received liberal presents for their conscientious services. Later when the Temples safeguarded valuables as a matter of business, they made regular and substantial charges and the records indicate that they also lent their own funds at interest."

We read that the same facilities were found in Rome, as follows:

"Ample facilities were furnished by the State for the safe-keeping of money and other valuables. Public repositories were maintained by the government in which the citizens were given the use of guarded safe deposit vaults. The ruins of the buildings used for this purpose, some of which are of vast extent, give a very definite idea of the solidity of the Roman economic system and the secure and firm foundation upon which its wealth was founded."

The uncontradicted testimony in this case shows that plaintiffs' safe deposit departments and facilities are necessary and integral services for their customers and the public generally, and that similar facilities are in operation throughout the entire national banking system of the country, carrying the unquestioned approval of legality by the Comptroller of the Currency, their supervisory authority, as well as by Congress. See 12 U. S. C. A., § 24, p. 19, which refers in detail to corporate powers of associations, including reference to safe deposit boxes, as follows:

"Provided, That in carrying on the business commonly known as the safe-deposit business the association shall not invest in the capital stock of a corporation organized under the law of any state to conduct a safe-deposit business in an amount in excess of 15 per centum of the capital stock of the association actually

paid in and unimpaired and 15 per centum of its unimpaired surplus.''

██ National banks are instrumentalities of the federal government not subject to state laws which conflict with federal statutes or impair the efficiency of such banks: *McCulloch v. Maryland,* 4 Wheat. 316 (4 L. Ed. 579) ; *Davis v. Elmira Sav. Bank,* 161 U. S. 275 (16 S. Ct. 502, 40 L. Ed. 700) ; *First Nat. Bank v. State of California,* 262 U. S. 366 (43 S. Ct. 602, 67 L. Ed. 1030). The operation of safe deposit vaults by national banks is within the incidental powers granted to such banks by Congress and therefore is not ultra vires: 12 U. S. C. A. § 24; *Pattison v. Syracuse Nat. Bank,* supra; *First Nat. Bank v. Graham,* supra.

It would seem that safe deposit vaults were fully as necessary an adjunct to national banks as the desks and equipment in the foyer of a bank to provide for the convenience of customers. The practice initiated by the early banks in the temples of ancient Greece and the state-protected depositories of Rome grew into a custom which has rolled down through the ages to the present time, of which the plantiff national banks are an example. The practice persisted through the centuries as incidental to the business of banking, and in modern times is an integral and necessary feature thereof. Special deposits have been a factor in the business of banking from the dawn of banking history and still hold a place in the banking structure. Today the use of safe deposit boxes has largely superseded the entrusting of valuables to bank officials for safe-keeping. In early days people had no facilities of their own for the protection of their gold, silver and precious stones and therefore left their treasures with the bankers, to be protected and returned upon request.

The practice of entrusting valuables to bankers was referred to by Mr. John N. Edlefsen in his testimony, as follows:

"Q. Give your reasons why the operation of a safety deposit department by a National Bank is a necessary part of its service under modern banking conditions.

"A. Well, it seems to be an integral part of the banking operation to give that type of service. Years ago, you may remember, particularly in the smaller banks, people left their valuables or bonds and securities, insurance policies, in an envelope and gave it to the banker or put it in a tin box and asked them to keep it, which was very unsafe, and practically all banks have departed from that practice and enforced the rule to use safety deposit boxes if people have use for such facilities. It was obvious that the old practice of taking care of papers in an envelope was unsafe, as far as the bank was concerned. People generally, who may deal in one or all of the departments of the bank, would certainly complain if they were told that they couldn't have safety deposit facilities in the same institution; if they were told that they would have to go to some other place."

The receiving of special deposits is now a fully-accepted part of the banking business, even though the relation between the depositor and the bank is a bailor-bailee relation, rather than the customary banking relation of debtor and creditor. See *Rodgers v. First Nat. Bank*, supra, where we read:

"The phrase 'special deposits' has been held to embrace bonds of the United States. [Citing cases] The handling and receiving for special deposit of United States bonds and public securities may in their very nature come within or partially within the regular line of banking business. It is profitable to banks to be the custodian of their depositors' government securities. The clipping of interest coupons of such bonds and their

deposit in the bank as money is at least incident to the banking business.''

The same convenience as to clipping coupons would exist where people kept their government securities in safe deposit vaults and would accelerate the business of the bank. While for convenience the law of warehousemen is applied to the operation of safe deposit vaults, it is no more a true warehousing than it is a special deposit, for precisely the same reason that the operator of a safe deposit vault has not full custody of the property deposited therein, nor does he in most instances know of what the property consists. Safe deposit boxes are rented in most instances by people who, like the ancients, have valuables, particularly securities, which the renters have no facilities for keeping safely elsewhere. These securities require periodic attention for the cutting of coupons or for sale or exchange, and it stands to reason that ordinarily the collection of these coupons will be made through the bank in which the safe deposit vault is located, and the sale or exchange of securities already owned or the purchase of new securities will be made through that bank as a matter of convenience and protection. There is no necessity in such cases for the carrying of valuable securities from one place to another with the consequent danger of loss.

The testimony of three bank officials is unanimous to the effect that the safe deposit business is quite clearly one of the integral functions of banking business, and a bank not having a safe deposit vault would find that customers would naturally take their collateral, if they could not avail themselves of a safe deposit department in a certain bank, where they could have the convenience of a safe deposit department.

The testimony shows that the operation of a safe deposit vault by a bank is a financial service to the bank's clientele and others, on the one hand, and a financial benefit to the bank on the other, plainly showing that safe deposit vaults must be considered an integral part of the business of banking, even though such operation is not expressly named in many definitions of banking.

■ Congress has the power, under the constitution, to provide for the administration of government finances in such manner as it may see fit. In carrying out this power it has provided for the creation of national banks and has made them instrumentalities of the federal government, defining their powers and jealously guarding them against any encroachment by state legislation that in the slightest degree affects the efficiency of such banks in their federal duties: *McCulloch v. Maryland,* supra; *Davis v. Elmira Sav. Bank,* supra; *First Nat. Bank v. State of California,* supra.

■ Defendants contend that the powers specifically enumerated constitute the full measure of the incidental powers granted to national banks. They contend that as Congress is the only source from which national banks can acquire authority to engage in certain practices, these practices must clearly appear in the enabling statutes, if they are to be carried on. If strictly adhered to, this view is too narrow and would curtail the privilege of national banks to borrow money, when necessary, or operate a collection department or escrow department.

Time was, perhaps, when the safe deposit vault business would not be considered an integral part of the banking business, but in this day and age, as the testimony shows, the modern bank is not complete without safe deposit facilities, just as in earlier times the

business of banking would have failed in one of its most important phases if the practice of receiving valuables for safe-keeping had been eliminated.

■ There is embodied in the proviso contained in paragraph 7, § 24, Title 12, U. S. C. A., an unquestioned recognition of the safe deposit business of national banks as one of its incidental powers. "Provided, That in carrying on the business commonly known as the safe deposit business" is the language of the proviso. This language recognizes the fact which Congress knows, which every banker knows, and which the courts and public know, that such safe deposit business is being carried on by every important national bank in the entire country. This proviso was not a grant of an exclusive power, forbidding the exercise of the power in any other manner, but rather it is an extension of the power to conduct a safe deposit business, an alternative method.

In *Owensboro Nat. Bank v. City of Owensboro*, 173 U. S. 664 (19 S. Ct. 537, 43 L. Ed. 850), in which the bank brought suit to restrain the city from enforcing the collection of a franchise and intangible property tax, the court, in granting the injunction, held that a city is without power to tax national banks except under the permissive legislation of Congress, and that the assessment and attempted collection of any type of tax not specially permitted by section 5219, U. S. R. S., was illegal.

In *Austin v. City of Seattle*, 176 Wash. 654 (30 P. (2d) 646, 93 A. L. R. 203), the city brought criminal proceedings for violations of ordinances imposing an occupational tax, and at the same time the defendants sought an injunction against the city to restrain the enforcement of the ordinance. It was urged that the ordinance

was invalid because it excepted national banks. The court held:

"Nothing is pointed out and we know of no legislation which attempts to confer the power to license or tax national banks upon the cities of our state."

■ The Oregon legislature has enacted the following provisions regarding taxation of national banks in Oregon:

"Every national banking association located within the limits of this state shall annually pay to the state an excise tax according to or measured by its net income, to be computed, in the manner hereinafter provided, at the rate of five (5) per cent upon the basis of its net income for the year 1930, and at the rate of eight (8) per cent upon the basis of its net income for the year 1931 and for each year thereafter." § 69-1303, as amended.

"The tax referred to in sections 3 and 4 hereof (§§ 69-1303, 69-1304, Oregon Code), shall be in lieu of all other state, county and municipal taxes, upon the corporations and associations therein mentioned, except taxes upon their real property." § 69-1305, Oregon Code 1930.

Since the statute above set forth specifically declares that the excise tax described in section 69-1303, as amended, "shall be in lieu of all other state, county and municipal taxes" upon national banks, the imposition of this license tax upon national banks for the privilege of operating safe deposit vaults is expressly prohibited thereby.

■ The city of Portland, acting through its officers and agents, has no power to assess and collect this license or occupational tax from plaintiffs, and said ordinance so providing is unenforceable as to plaintiffs, for the reasons that the operation of safe deposit vaults is within the incidental powers granted

to national banks by Congress as an integral part of the business of banking; that plaintiffs are instrumentalities of the federal government beyond the control of state legislation where such legislation, as in the instant case, impairs the efficiency of such instrumentalities; that Congress has restricted state taxation of national banks to one of the four methods set forth in section 5219, U. S. R. S. (12 U. S. C. A., § 548); that such permission does not cover license or occupational fees upon any department of said banks' activities, and that the laws of the state specifically prohibit the imposition of a license or occupational fee upon national banks.

It follows that the decree of the lower court should be affirmed. It is so ordered.

BAILEY and BELT, JJ., not sitting.