UNITED STATES of America, Plaintiff,

v.

COUNTY OF LOS ANGELES; Board of Supervisors, County of Los Angeles; Edmund D. Edelman, Kenneth Hahn, Deane Dana, Michael D. Antonovich, Peter F. Schabarum, Supervisors, County of Los Angeles; Gabriel A. Gutierrez, Presiding Judge, Juvenile Court, Los Angeles County; Barry Nidorf, Chief Probation Officer, County of Los Angeles; Lula Hurte, Deputy Director, Detention Services Bureau, County of Los Angeles; Sidney I. Dwoskin, Superintendent, Central Juvenile Hall; Shirley Gray, Superintendent, Los Padrinos Juvenile Hall; Richard L. Oren, Superintendent, San Fernando Valley Juvenile Hall, Defendants.

No. CV 86–1951–RMT(Tx).

United States District Court, C.D. California.

May 9, 1986.

Wm. Bradford Reynolds, Arthur E. Peabody, Jr., Benjamin P. Schoen, Daniel S. Jacobs, Robert A. Spelke, U.S. Dept. of Justice, Washington, D.C., Herbert Booker, Asst. U.S. Atty., Los Angeles, Cal., for U.S. of America.

De Witt Clinton, Co. Counsel, Richard E. Townsend, Acting Asst. Co. Counsel, Kevin C. Brazile, Sr., Associate Co. Counsel, Los Angeles, Cal., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

TAKASUGI, District Judge.

This matter having come before the court for hearing on May 5, 1986 on the motion by plaintiff for preliminary injunction, and this court having considered the pleadings and other documents filed herein and argument of counsel, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On March 14, 1985 the United States Attorney General ("USAG") authorized an investigation under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* ("CRIPA") into conditions of confinement at the three Los Angeles County Juvenile Halls.

2. On March 28, 1985 the United States Department of Justice ("DOJ") notified the Los Angeles County Board of Supervisors and Los Angeles County Counsel of the USAG's intention to investigate conditions at the juvenile halls.

3. On May 2, 1985 DOJ attorneys met with County officials in Los Angeles, described their intended investigation and requested access to the juvenile halls, records and juveniles held therein.

4. From June through August 1985, the DOJ continued to seek Los Angeles County cooperation in providing access and in approving expert consultants the DOJ selected to assist in the investigation.

5. On August 27, 1985 DOJ attorneys, expert consultants and a paralegal arrived at one of the juvenile halls to begin inspection and were directed by County officials to Presiding Judge Gabriel Gutierrez of the Los Angeles County Juvenile Courts. Judge Gutierrez denied access by the DOJ team to the juvenile halls and its records apparently requiring a Juvenile Court order for access pursuant to California Welfare and Institutions Code § 827.

6. The DOJ, therefore, submitted a letter to Judge Gutierrez on August 27, 1985 requesting immediate access to juvenile hall records and permission to interview juveniles held in the facilities. The letter proposed a comprehensive agreement allowing reasonable access and specifying all steps the DOJ would take to protect the confidentiality of the juveniles involved.

7. On August 18, 1985, Judge Gutierrez met with DOJ attorneys, denied their request for a comprehensive agreement and issued an order allowing limited access and granting some of the requests of the DOJ. The DOJ acceded to the limitations of the order.

8. On September 24, 1985 the DOJ sent two letters, one to Barry Nidorf, Chief Probation Officer for the County, and the

other to Judge Gutierrez. The letter to Nidorf informed him that the DOJ scheduled another tour of the juvenile halls for October 7–11, listed the information needed by the DOJ and advised him of an additional expert consultant, Dr. Milton Shore, that would accompany the DOJ team. The letter to Judge Gutierrez stated the DOJ's position of entitlement to full access to the institutionalized persons and their records and any facility being investigated and reiterated all steps the DOJ would take to protect the confidentiality of the juveniles involved.

9. By letter dated October 2, 1985, Judge Gutierrez responded to the DOJ letter and denied the DOJ's request for full access to the juveniles and their records. The letter reiterated Judge Gutierrez's position that under California Law the juvenile court has exclusive authority to control access to juvenile records, that the court's procedure therefor is applied on a case by case basis and that as a precondition to access, DOJ attorneys and staff would be required to sign the confidentiality conditions. The letter also stated that Judge Gutierrez saw several problems with allowing Dr. Shore to interview juveniles and, therefore, the judge could not acquiesce to his participation without first resolving the issues.

10. On October 17, 1985 DOJ attorneys and Judge Gutierrez met and reached agreement on the confidentiality concerns and mechanics for protecting such confidentiality concerns.

11. Pursuant to the October 17, 1985 meeting and agreement, the DOJ sent a written confidentiality agreement executed by DOJ attorneys, paralegals and expert consultants to Judge Gutierrez for his signature.

12. By letter dated November 13, 1985, the County Counsel informed the DOJ of changes to the confidentiality agreement required by Judge Gutierrez, including a format change to a court order whereby Judge Gutierrez would be granting access to the juvenile halls to the signatories of the confidentiality agreement. The County

Counsel's letter acknowledged the DOJ's position that state and local authorities may not restrict the DOJ's access, but stated that unless the DOJ could provide statutory or case law authority supportive of its position, the County was bound to follow the state law discussed in Judge Gutierrez's October 2, 1985 letter.

13. Because of Judge Gutierrez's requirement that access would only be granted upon court order rather than by agreement, the DOJ cancelled the scheduled tours.

14. The United States brings this action against the County of Los Angeles, the Board of Supervisors, Judge Gutierrez and several county officials connected with the juvenile hall system seeking an injunction against defendants prohibiting them from denying or obstructing access by the DOJ to the Los Angeles Juvenile Halls, the juveniles held therein and their records.

15. As neither party has provided this court with evidence of the above facts except for copies of letters and other written documents exchanged in their correspondence, the above facts are derived from the statement of facts contained in both parties' legal briefs and are only those facts to which both parties' statements of facts substantially agree.

16. At the commencement of the hearing held on May 5, 1986, the court asked counsel if there were any objections to the trial of the action on the merits being advanced and consolidated with the hearing on the application for preliminary injunction.

17. Plaintiff stated it had no objection. Defendants objected. Whereupon the court inquired as to what intended discovery or other reasons defendants had as their basis for objection. Defendants responded that they intended to discover plaintiff's policy manuals, procedures and rules regarding confidentiality and CRIPA.

18. Having found defendants' intended discovery to be irrelevant to the issues raised by this action, the court, at the May 5, 1986 hearing, ordered that the trial of

the action on the merits be advanced and consolidated with the hearing on the application for preliminary injunction.

Any finding of fact which may be deemed a conclusion of law is incorporated into the Conclusions of Law section below, and any conclusion of law which may be deemed a finding of fact is incorporated into the Findings of Fact section above.

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction. 28 U.S.C. § 1345.

2. Judge Gutierrez, as Presiding Judge of the Los Angeles Juvenile Court, asserts the exclusive authority of the juvenile court, pursuant to the California Welfare and Institutions Code, to control access to juvenile records and specifically cites § 827 as the legal authority for requiring permission from the juvenile court before access can be gained.

3. California Welfare and Institutions Code Section 827 provides, in pertinent part, as follows:

(a) Except as provided in Section 828, a petition filed in any juvenile court proceeding, reports of the probation officer, and all other documents filed in any such case or made available to the probation officer in making his or her report, or to the judge, referee or other hearing officer, and thereafter retained by the probation officer, judge, referee, or other hearing officer, may be inspected only by court personnel, the minor who is the subject of the proceeding, his or her parents or guardian, the attorneys for those parties, and such other persons as may be designated by court order of the judge of the juvenile court upon filing a petition therefor. . . .

4. Referring to the statutory scheme to protect confidentiality of juvenile court records provided in the California Welfare and Institutions Code, the California Supreme Court in *T.N.G. v. Superior Court,* 4 Cal.3d 767, 776–77, 94 Cal.Rptr. 813, 484 P.2d 981 (1971), stated as follows:

Section 827 carefully prohibits the inspection of any "petition filed in any juvenile court proceeding, reports of the probation officer, and all other documents filed in any such case" by anyone other than court personnel, the juvenile, his parents, and his attorney, except with the express approval of the juvenile court judge. Section 676 provides that juvenile court proceedings are not open to the public. And section 781 insures that a juvenile may obtain an order, five years after his detention or when he becomes 21, which seals his juvenile court record even from inspection by juvenile court personnel and which requires the destruction of all records pertaining to the case in the custody of "any other agencies, including law enforcement agencies, and public officials as petitioner alleges, in his petition, to have custody of such records."

(Footnotes omitted.)

5. Pursuant to CRIPA:

Whenever the Attorney General has reasonable cause to believe that any State or political subdivision of a State, official, employee, or agent thereof, or other person acting on behalf of a State or political subdivision of a State is subjecting persons residing in or confined to an institution, as defined in section 2 [42 U.S.C. § 1997], to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities, the Attorney General, for or in the name of the United States, may institute a civil action in any appropriate United States district court against such party for such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges, or immunities, except that such equitable relief shall be available under this Act to persons residing in or confined to an

institution as defined in section 2(1)(B)(ii) [42 U.S.C. § 1997(1)(B)(ii) ] only insofar as such persons are subjected to conditions which deprive them of rights, privileges, or immunities secured or protected by the Constitution of the United States.

42 U.S.C. § 1997a(a).

6. CRIPA also provides as follows:

At the time of the commencement of an action under section 3 [42 U.S.C. § 1997a] the Attorney General shall certify to the court—

\* \* \* \* \* \*

(2) that he has notified in writing the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution of his intention to commence an investigation of such institution, that such notice was delivered at least seven days prior to the commencement of such investigation and that between the time of such notice and the commencement of an action under section 3 of this Act [42 U.S.C. § 1997a]—

(A) he has made a reasonable good faith effort to consult with the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution, or their designees, regarding financial, technical, or other assistance which may be available from the United States and which he believes may assist in the correction of such conditions and pattern or practice of resistance;

(B) he has encouraged the appropriate officials to correct the alleged conditions and pattern or practice of resistance through informal methods of conference, conciliation and persuasion, including, to the extent feasible, discussion of the possible costs and fiscal impact of alternative minimum corrective measures, and it is his opinion that

reasonable efforts at voluntary correction have not succeeded; and

(C) he is satisfied that the appropriate officials have had a reasonable time to take appropriate action to correct such conditions and pattern or practice, taking into consideration the time required to remodel or make necessary changes in physical facilities or relocate residents, reasonable legal or procedural requirements, the urgency of the need to correct such conditions, and other circumstances involved in correcting such conditions; and

42 U.S.C. § 1997b(a).

7. CRIPA not only recognizes the need for a DOJ investigation prior to commencing a CRIPA action, it also requires that the County be given a seven-day prior written notice of intention to commence investigation. 42 U.S.C. § 1997b(a)(2).

8. The issue raised is whether the DOJ, in seeking to conduct its CRIPA investigation, is subject to the juvenile court's authority to control access to juvenile records pursuant to California Welfare and Institutions Code § 827 or said state law is preempted by CRIPA.

9. Because CRIPA contains no explicit preemptive language, any Congressional intent to supersede state law must be inferred by either federal occupation of the field or a federal/state statutory conflict. *Fidelity Federal Savings & Loan Assn. v. DeLaCuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

10. The applicable preemption analysis here concerns the statutory conflict insofar as the state law " 'either frustrates the purpose of the national legislation or impairs the efficiency of those agencies of the Federal government to discharge the duties, for the performance of which they were created.' " *Nash v. Florida Industrial Commission*, 389 U.S. 235, 240, 88 S.Ct. 362, 366, 19 L.Ed.2d 438 (1967) (quoting *Davis v. Elmira Savings Bank*, 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896)).

11. The premption question posed is, given that the congressional intent and purpose of CRIPA is to investigate and correct institutional civil rights violations, is the purpose frustrated or obstructed by the application of the state law.

12. To determine whether an obstacle exists, it is necessary to evaluate two considerations: (1) the scope or type of investigation contemplated by Congress, and (2) whether California Welfare and Institutions Code § 827, as applied, frustrates this contemplated investigation and spirit of cooperative improvement.

13. Legislative history indicates that, Congress recognizes that before initiating litigation with respect to a particular institution, the Attorney General must, of course, thoroughly investigate such institution. It is anticipated that the States and relevant officials will cooperate in the investigative process. If there is a failure to do so, the Attorney General may consider this factor in taking any actions under this Act.

H.R.Con.Rep. No. 897, 96th Cong., 2nd Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Ad. News 787, 836.

14. The Senate Report definitely contemplates access in conjunction with other comprehensive investigative measures in explaining the value of the DOJ's involvement:

A number or [sic] factors make the contribution of the Attorney General a unique and invaluable one. First, ... private litigants, even with the assistance of legal services and public · interest groups, cannot marshal the resources necessary to mount a full-scale attack on system-wide institutional abuse. The Justice Department, however, does possess such resources. The Department can call upon the FBI to conduct thorough investigations of institutions, taking photographs and collecting relevant data on institutional conditions. It has ready access to the expertise of other Federal agencies, including the Department of Health, Education, and Welfare, the Bureau of Prisons, and the Law Enforcement Assistance Administration, whose experts can evaluate the data collected by the FBI or make independent inspections. Indeed, the committee would expect the Department of Justice normally to consult with HEW and other relevent [sic] agencies in order to determine whether to bring suit and what relief is appropriate. From its past experience in the field, the Justice Department is familiar with and has access to nationally recognized experts in mental health, mental retardation, penology, and public health, and can rely upon such experts for accurate and responsible assessments of the adequacy ofinstitutional conditions. All of these factors contribute to the Department's unique ability to develop a full and fair factual record for the court.

S.Rep. No. 416, 96th Cong., 2nd Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Ad. News 787, 803, 804 (footnotes omitted).

15. The facts herein indicate that the DOJ attempted to resolve and accommodate the County's legitimate interest in protecting the confidentiality interests of the juveniles.

16. A significant delay in the DOJ investigation has occurred, caused by ineffective negotiation and consequent failure to satisfy the County and Juvenile Court.

17. Conditioning access to the juvenile halls on the DOJ's acquiescence to the Juvenile Court's authority to control such access under California Welfare and Institutions Code § 827, constituted, under the facts herein, a complete restriction.

18. The Juvenile Court's stated intentions to restrict records access to a case by case determination and to restrict the DOJ's choice and use of expert consultants obstructs and frustrates the DOJ investigation.

**594**

19. Although the Juvenile Court's concern with protecting the confidentiality interests of the juveniles is commendable, its authority, under California Welfare and Institutions Code § 827, to restrict or deny the DOJ access to the juvenile hall, the juveniles held therein and their records, is preempted by CRIPA.

20. Plaintiff is entitled to an injunction prohibiting defendants from using California Welfare and Institutions Code § 827 as authority to restrict or deny plaintiff access to the juvenile halls, the juveniles held therein and their records.