524 So.2d 295 (1987)
DEPOSIT GUARANTY NATIONAL BANK
v.
B.N. SIMRALL & SON, INC.
No. 56469.
Supreme Court of Mississippi.
April 8, 1987.
Rehearing Denied May 4, 1988.
*296 Joe H. Daniel, J. Price Coleman, Timothy E. Hurley, Daniel, Coker, Horton & Bell, Rhesa H. Barksdale, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, for appellant.
Robert S. Murphree, Jackson, Robert R. Bailess, Wheeless, Beanland, Shappley & Bailess, Vicksburg, for appellee.
En Banc.
HAWKINS, Presiding Justice, for the Court:
Deposit Guaranty National Bank appeals from a judgment of the circuit court of Yazoo County in favor of B.N. Simrall & Son, Inc., for $84,639.66 for offsetting funds of a cotton buyer's general business account to apply on an indebtedness due the bank by the cotton buyer, and thereby causing the check by the cotton buyer to Simrall for $84,639.66 to be returned for insufficient funds.
Finding the bank had the authority to offset the deposit and apply it against the cotton firm's indebtedness, we reverse and render judgment here for the bank.

FACTS
In the late '70s Holmes & Barrier was a cotton buying firm operating out of Yazoo City. This business began in 1934 and in the '70s two sons, Jerry B. Barrier and B.J. Barrier, III, purchased the firm from their father, and thereafter operated as a general partnership under this trade name.
Barnwell and Hays, Inc., is a close Tennessee corporation, with principal offices in Memphis, also engaged in cotton buying. Its president was Andrew Jackson (Jack) Hays, Jr.
Although the record refers to the Barrier firm as Holmes & Barrier, and Barnwell and Hays, Inc., as Barnwell and Hays, because the close similarity of the names, in this opinion the Holmes and Barrier firm will be referred to as the "Barriers," and the Memphis firm as "Barnwell and Hays."
Also in the late '70s these two firms engaged in a joint venture for the purchase and sale of "gin direct" cotton. A group of Mississippi cotton farmers in and around Yazoo County were contacted by the Barriers to sell their cotton under a "gin direct contract." Several thousand bales of cotton would be bought under these contracts. Barnwell and Hays marketed the cotton thus purchased. The advantage of this type of contract to the farmer was the ability to sell his cotton from the gin without having to store it in a compress, and thereby avoid the storage charges.
Typically the procedures were as follows. In the spring the farmer and the Barriers contracted for the purchase by the Barriers of a certain number of bales of cotton at a cotton futures base price, less a point discount. Discount would also be made based upon the grade of cotton. Thus, a farmer entering a contract with the Barriers in March could choose the prevailing futures price for December cotton. The Barriers would agree to pay him at that price when delivered, less a set, agreed upon discount. The contract was only with the Barriers, and the farmer was never told there was another firm involved, or this was a joint venture. Barnwell and Hays, however, was promptly notified when any contract was executed.
To hedge against market fluctuations, Barnwell and Hays upon the execution of such a contract usually purchased a futures contract to sell a certain number of bales of December cotton.
In the fall when the farmer delivered his bales to the gin, cotton samples would be taken for classing the cotton, and the cotton would be loaded on trucks under bills of lading showing Barnwell and Hays as the owner and a designated cotton textile mill as the destination.
When the cotton was delivered to the mill, if the quality was acceptable the mill accepted the cotton and remitted a check to Barnwell and Hays. Occasionally bales of cotton would be rejected and Barnwell and Hays would have to bear the expense of storing such rejected cotton until sold. Also upon occasion the ginned cotton had to be stored for a brief period in a local compress.
*297 Meanwhile, the cotton samples and class cards were sent to Greenwood where U.S. Department of Agriculture employees graded the cotton and wrote the grade on the class cards, and returned them to the gin. In the fall of the year this usually took two or three weeks.
When the farmer got his class cards he would take them to the Barriers' office in Yazoo City where an employee of the Barriers would work up an invoice showing the sale of the cotton to the Barriers, and the Barriers after doing so would make out a check to the farmer for bales of cotton based upon the contract price per pound. On that same day the Barriers would telephone Barnwell and Hays, notifying it of the purchase and the amount to transmit to the Barriers. Barnwell and Hays would then wire the requested amount to the Barriers' bank in Yazoo City to be deposited in the Barriers' general business checking account. The Barriers would request an excess of the amount paid the farmer in order to take care of commissions and United States government charges, usually amounting to a little over two dollars a bale. Barnwell and Hays occasionally made wire transfers to the Barriers for other purposes, such as wiring the Barriers their share of the profits derived from the joint venture. All checks to farmers in payment for cotton purchased under the gin direct contracts were paid out of the general business checking account of the Barriers. This same account was used for all business transactions and payment of all business expenses.
The joint venture's business expenses consisted of trucking, telephone and insurance charges, storage charges for rejected cotton until sold, and employee salaries. The joint venture made profits by selling the cotton for more than the contract price, and also by collecting interest on the money from the time the mill paid Barnwell and Hays until the farmer was paid. Following delivery of the cotton to the mill, the mill would usually make a check to Barnwell and Hays within five days. Interest derived by the joint venture in this manner was called a "float." The Barriers for a much shorter period also got a "float" from the time they wrote the farmer a check until it cleared their account. When all the cotton under the gin direct contracts had been sold, Barnwell and Hays deducted all expenses and the profits were then divided equally between the joint venturers. In 1981 the joint venture made a net profit of approximately $300,000. A copy of one of the gin direct contracts involved in this case is made an appendix to this opinion.
While these gin direct cotton contracts amounted to several million dollars yearly business for both of these firms, it was by no means all the cotton business either of them did.
The Barriers also bought and sold thousands of bales of cotton in the conventional manner. As a result of these dealings, other cotton merchants also wire transferred funds into the Barriers' general business account.
In 1981 the local bank in Yazoo City merged with the Deposit Guaranty National Bank of Jackson (DGB). The Barriers were shareholders in the local bank and following the merger were also shareholders in DGB.
DGB was interested in securing the Barriers' business. DGB not only wanted their deposits, but more importantly, wanted to be their prime lender in all their cotton purchases. DGB actively solicited the Barriers' business and subsequently learned about the financial strength of the Barriers individually and of their firm, Holmes and Barrier. DGB also learned the Barriers' monetary needs in purchasing and selling cotton. The written information and discussions between officers of DGB and Jerry Barrier also clearly revealed that no bank financing would be required in the gin direct cotton transactions. The Barriers only needed to borrow from DGB for the conventional cotton buying in which the Barriers engaged.
In conventional buying when the Barriers bought cotton, ownership was evidenced by compress receipts on each bale of cotton, in which DGB was given a security interest by a security agreement executed by the Barriers. Also DGB was to *298 be given physical possession of the receipts. The Barriers' loan was backed by these compress receipts. Deposit Guaranty Bank extended the Barriers a $15,000,000 line of credit, and on September 18, 1981, the Barriers executed a $15,000,000 master note unto Deposit Guaranty, and security agreements to secure this indebtedness to the bank. The security agreement specifically gave Deposit Guaranty Bank the right to "appropriate and apply to any indebtedness secured hereby, whether or not then due, any monies now or thereafter held by Bank on deposit or otherwise to the credit or belonging to the debtor ..."
This same arrangement between Deposit Guaranty Bank and the Barriers extended into 1982, except the line of credit was reduced from $15,000,000 to $10,000,000. In 1982 the Barriers had only one checking account in the Yazoo City branch of Deposit Guaranty Bank, a general operating account in the name of Holmes & Barrier, through which all business transactions of this partnership were made and out of which all expenses were paid.

ENTER SIMRALL
B.N. Simrall & Son, Inc. (Simrall), is a close corporation engaged in farming in Warren County. Its president was Newell Simrall, III. Simrall was one of the farmers of a group which entered into gin direct contracts with the Barriers in 1982. On March 18, 1982, Simrall and the Barriers executed a gin direct contract for 1,000 bales of cotton (see appendix), which was orally amended on June 30 to add 300 bales. Also on September 1 Simrall and the Barriers executed another gin direct contract for 500 bales of cotton. Simrall duly delivered his cotton to the Satartia Gin for baling that fall, which was transported under bills of lading showing Barnwell and Hays as the owner. Upon receipt of class cards for 268 bales of cotton in late October, Newell Simrall delivered them to the Barriers' firm in Yazoo City and requested payment. An employee at the Barriers prepared two invoices dated November 1, 1982, on a Holmes & Barrier of Yazoo City letterhead, listing the bales of cotton, weight, and purchase price of each bought from "B.N. Simrall & Son." The total of one of the invoices was $58,791.00, and the other $25,848.66.
On November 1 the Barriers mailed Simrall a check of the same date for $84,639.66 drawn on the Holmes & Barrier account of the Yazoo City bank. Also on that day by telephone the Barriers requested Barnwell and Hays to make a $119,896.73 wire transfer to their account. This covered the 268 bales of cotton purchased from Simrall and 100 bales from R.E. Coker, plus the additional charges. The funds were promptly wired by Barnwell and Hays describing it as a "transfer from Barnwell and Hays for credit of Holmes & Barrier." On November 2 the Barriers' account in Yazoo City was credited with the $119,896.73 deposit.
Between November 1 and November 9, numerous checks were presented for payment and charged against the general account. These checks were for a number of diverse expenses, ranging from employee salaries and storage charges to cotton purchases from gin-direct and non-gin-direct farmers. During this same timeframe numerous deposits from a variety of sources were credited to the Barrier account. In short, the account was used for a myriad of purposes, like any typical checking account.
Simrall received the $84,639.66 on Friday, November 5, and it was deposited in Simrall's Vicksburg bank the following Monday, November 8.
During this time, cotton prices dropped. Deposit Guaranty Bank had by then become alarmed at the Barriers' financial condition, the status of several thousand compress receipts secured by the security agreement, and an overdraft of the Barrier firm at a Greenwood bank. On November 9 DGB offset the Barriers' deposit in the Yazoo City branch bank and applied it to the Barriers' indebtedness to DGB. When the $84,639.66 check to Simrall was presented to the Yazoo City branch bank for payment, it was not honored but was returned with a notation that the account had insufficient funds.
*299 The record does not reveal precisely what happened to the Barriers' firm, except to indicate that bankruptcy was either begun or contemplated.
Simrall was not paid, and brought this suit against Deposit Guaranty Bank in the circuit court of Yazoo County. The facts as above related were developed at trial. Newell Simrall acknowledged that in all of his dealings regarding the cotton contracts, that they were solely with the Barriers' firm in Yazoo City, and that he had no prior knowledge before November 9 that Barnwell and Hays was involved in any way.
At the conclusion of trial DGB made a motion for a directed verdict. The circuit judge ruled as follows:
THE COURT:
There are two things definite that I have determined from the evidence and that is that we don't have a trust fund nor a special deposit. Neither of those theories have been established by any testimony and evidence that I've heard and, really to the contrary, I think it's been established there was neither. The only possibility that I can see of allowing this case to go to the jury, and I will allow it to go to the jury, is either some theory of constructive trust or conversion. I will allow it to go to the jury on either of those theories and we're going to start with the plaintiff's instructions.
Vol. VIII, pp. 1377, 1378.

LAW
Simrall & Son understood throughout that it was dealing with the Barriers, the firm of Holmes & Barrier of Yazoo City. The contract was with Holmes & Barrier, the class cards were delivered to that firm in Yazoo City, and the cotton invoices were to the Holmes & Barrier of Yazoo City firm. In addition, Simrall was mailed a check for $84,639.66 drawn on the Holmes & Barrier of Yazoo City account in Yazoo City, no doubt as thousands of bales had been bought and sold through this firm over the years. The only thing which suggested any connection with Barnwell and Hays prior to November 9, 1982, was the shipping order, or bill of lading prepared at the gin showing "B & H Cotton Co." as the shipper. Whether anyone connected with Simrall ever saw one of these bills of lading prior to November 9 is not disclosed by the record.
Neither did any of the wire transfers from Barnwell and Hays to the Barriers, including the one for $119,896.73, attempt to specially designate the use of the funds beyond being deposited to the credit of the Holmes & Barrier account in Yazoo City. Simrall was not paid, and obviously is still due the sales price of its cotton from the joint venture. It chose not to sue either Holmes and Barrier, Barnwell and Hays or the joint venture.
We are not called upon to address what liability the joint venture or either of the joint venturers have to Simrall. Nor, are we required to address what liability, if any, Deposit Guaranty Bank might have in a suit by Barnwell and Hays, and we expressly refrain from doing so.
Our concern is what liability, if any, does Deposit Guaranty Bank have to Simrall.
The Holmes and Barrier account with DGB was a general business account, used by the firm in the usual course of its business. It is well settled that funds deposited to a general account belong to the bank, with the bank becoming a debtor to the owner of the account for the amount on deposit. Deposit Guaranty Bank & Trust Co. v. Merchants Bank & Trust Co., 171 Miss. 553, 158 So. 136 (1934); Deer Island Fish & Oyster Co. v. First Nat'l Bank, 166 Miss. 162, 146 So. 116 (Miss. 1933); Moreland v. Peoples Bank of Waynesboro, 114 Miss. 203, 74 So. 828 (1917). As was stated by the U.S. Supreme Court in Davis v. Elmira Savings Bank, 161 U.S. 275, 40 L.Ed. 700, 702, 16 S.Ct. 502 (1896): "The deposit by a customer with his banker is one of loan, with the superadded obligation that the money is to be paid when demanded by a check."
It is equally well settled that a bank, under a "set off" principle, has the right to apply a debtor's deposit to payment of his debt then due aside from any *300 security agreement specifically authorizing it to do so. In Moreland v. Peoples Bank, supra, we stated:
It is well settled that the bank itself has a right, if it so desires, to apply whatever amount the maker of the note has on deposit with it to a payment on the note. Or, in other words, the bank itself has the right to set off the amount it owes the depositor against the amount owed it by the depositor. The relation existing between a bank and a depositor is simply one of debtor and creditor.
114 Miss. at 211-12, 74 so. at 829-30.
It has been stated that it would be inequitable to permit a depositor to carry an open account in the bank which would induce the bank to feel secure in granting a certain line of credit, and then permit the debtor to apply the funds to another purpose than satisfying the debt simply because the debtor-depositor had not expressly agreed to apply the deposit to the debt due the bank. Southwest Nat'l Bank v. Evans, 94 Okl. 185, 221 P. 53 (1923).
The New Jersey Court stated in Marmon Fanning Co. v. People's Nat'l Bank, 106 N.J. Eq. 170, 150 A. 402, 404 (1930):
It is a general rule, that a bank has the right to set off or apply the deposit of its debtor to the payment of his matured debts, upon the theory that, as the depositor is indebted to the bank upon a demand which is due, the funds in its possession may properly and justly be applied in payment of such debt, and it has therefore a right to retain such funds until payment is actually made.
The right of set-off exists even if a bank's indebtedness is secured by collateral pursuant to a security agreement. Duncan v. Coahoma Bank, 397 So.2d 891 (Miss. 1981).
This is the rule as between a bank and its depositor. But what about a third party with an outstanding check against the account, but which he has not presented for payment when the bank exercises its right of set-off? In Citizens Nat'l Bank v. First Nat'l Bank, 347 So.2d 964, 968 (Miss. 1977), this Court stated:
It is now, and has been for a long time, the law in this State that the relationship between a bank and its depositors is one of debtor and creditor. Since it is a debtor-creditor relationship, the giving of a check by a depositor does not constitute an assignment of the funds on deposit. The bank may refuse to pay the check, although the depositor has sufficient funds to his credit to cover the check and the holder of the check has no cause of action against the bank. The holder of the check must look to the drawer of the check and only the drawer of the check can complain about the bank not honoring the check.
See also: Miss. Code Ann. § 75-3-409; J.B. Ehrsam & Sons Mfg. Co. v. Guaranty Nat'l Bank & Trust Co., 158 Colo. 84, 404 P.2d 844, 847 (1965); Steinbrecher v. Fairfield County Trust Co., 5 Conn.Cir. 393, 255 A.2d 138, 143 (1968); Conn v. Bank of Clarendon Hills, 53 Ill.2d 33, 289 N.E.2d 425, 428 (1972).
Simrall asserts that the rule of Citizens Bank is inapplicable to his case because the money wire transferred by Barnwell and Hays was his, and DGB knew enough about the joint venture to realize this fact. He supports this contention primarily by the cases collected in 8 A.L.R.3d 235, Bank's Right to Apply Person's Fund, Deposited in Debtor's Name, on Debtor's Obligations. These cases stand for the proposition that when a bank has knowledge of a trust, special deposit, or some other type of fiduciary relationship between its depositor and a third person, the bank cannot set-off such funds against the individual indebtedness of the depositor of the bank. As these cases indicate, before a third party can claim "ownership" of certain funds, that party must make a showing of the special character of the deposit, whether by trust fund, special deposit or fiduciary relationship. See: Lumberton State Bank v. Fortenberry, 222 So.2d 384 (Miss. 1969) (trust funds deposited to auctioneer's account); Armour-Cudahy Packing Co. v. First Nat'l Bank, 69 Miss. 700, 11 So. 28 (1892) (funds held in trust in selling agent's account); First Nat'l Bank v. Duncan, 127 Okl. 226, 260 P. 491 (1972) (funds held by commission *301 merchant for client); United States Fidelity & Guaranty Co. v. Adoue, 104 Tex. 379, 137 S.W. 648 (1911) (special designation of deposit). We find no cases in this annotation holding for the third party when a general deposit is made to a general operating account.
Unfortunately for Simrall, the facts of this case failed to make a jury issue on his contention. There was no proof of any kind of special deposit, trust or otherwise. There is a reason for every payment of money. The mere fact that a bank knows A sends money to B, which B deposits in his regular multi-purpose business checking account in order to pay C imposes no obligation on the bank to segregate the funds for C. If A, B or C want some other arrangement, it is the responsibility of at least one of them to specifically notify the bank they wish to handle the funds in some special manner.
As to deposits generally, the Florida Supreme Court stated in McCrory Stores Corp. v. Tunnicliffe, 140 So. 806, 807 (Fla. 1932):
Deposits are divided into two classes, general and special. A general deposit is a deposit generally to the credit of the depositor to be drawn upon by him in the usual course of the banking business; a special deposit is a deposit for safe-keeping to be returned intact on demand, or for some specific purpose not contemplating a credit on general account. A deposit in a bank is presumed to be general, in the absence of a special agreement importing a different character into the transaction.
Id. at 807.
It is undisputed that the Barnwell and Hays wire transfer was a general deposit. The funds contained no special designation, no instructions as to the use of the money, and no mention of Simrall. The funds wired to the Barriers' general business account were subject to being withdrawn by any check issued against the account for whatever purpose. The check to Simrall was a check drawn on the account in the usual course of business. Simrall, therefore, had no claim against DGB unless facts and circumstances could be proven which would take this case out of well settled principles. Simrall would have been protected if the funds wired by Barnwell and Hays had been specifically designated to be paid to the farmer. They were not.
Simrall put on no proof that the funds were held in trust for the gin-direct farmers. There was no proof of a special relationship between Simrall and the Barriers, where the Barriers were trustees for Simrall the beneficiary. Likewise, there was no showing of any wrong committed by the Barriers necessary to prove a constructive trust. To the contrary, the relationship between Simrall and the Barriers was nothing more than a buyer-seller transaction for the sale of cotton.
Regardless of these factual observations, Simrall insists that he "owned" the funds after the Barnwell and Hays wire transfer. We cannot agree with this assertion. Since the wire transfer in question was nothing more than a general deposit, the true owner of the funds was DGB. Moreland v. Peoples Bank, 114 Miss. 203, 213, 74 So. 828, 830 (1917).
We have, perhaps more than necessary to apply the proper legal principles to this case, set forth at length the manner in which these parties did business, and with sympathy for a cotton farmer who manifestly deserves to be paid. We have no doubt that DGB was aware that thousands of dollars of this account came from gin direct transactions with Barnwell and Hays, totally unrelated to the loan from DGB to the Barriers.
When the bank exercises its right of set-off against a general business account, especially one as here in which hundreds of thousands of dollars were deposited and spent each month, it has to know there are innocent third parties who are going to be injured. This knowledge, however, does not deprive the bank of such right. As we stated in Citizens Nat'l Bank v. First Nat'l Bank, supra, the payee can look only to the maker.
It follows that DGB had a right to set-off the amount deposited in the Barrier's account *302 on the debt due it by this firm, and therefore Simrall has no cause of action against the bank. The trial judge erred in allowing this case to go to the jury and the judgment of the circuit court should be reversed and judgment rendered here for Deposit Guaranty National Bank.
REVERSED AND RENDERED.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.
ANDERSON and GRIFFIN, JJ., not participating.

ON PETITION FOR REHEARING
DAN M. LEE, Presiding Justice, dissenting to Denial of Petition for Rehearing:
Deposit Guaranty National Bank appeals from a judgment of the Circuit Court of Yazoo County in favor of B.N. Simrall & Son, Inc., for $84,639.66 for offsetting funds of a cotton buyer's general business account to apply on an indebtedness due the bank by the cotton buyer, and thereby causing the check by the cotton buyer to Simrall for $84,639.66 to be returned for insufficient funds. We originally reversed the judgment in an opinion rendered April 8, 1987, on the basis of the failure of the proof to establish a "trust fund" or a "special deposit."
Because upon reflection I find that the jury received proper instruction and had sufficient evidence to decide that DGB knowingly set off funds belonging to Simrall, I would grant the petition for rehearing and affirm the jury's verdict.

FACTS
In the late '70's Holmes & Barrier was a cotton-buying firm operating out of Yazoo City. This business began in 1934 and in the '70's two sons, Jerry B. Barrier and B.J. Barrier III, purchased the firm from their father, thereafter operating as a general partnership under this trade name.
Barnwell and Hays, Inc., is a close Tennessee corporation with principal offices in Memphis, also engaged in cotton-buying. Its president was Andrew Jackson (Jack) Hays, Jr.
The record refers to the Barrier firm as Holmes & Barrier, and to Barnwell and Hays, Inc., as Barnwell and Hays; however, due to the similarity of the names, this opinion will refer to Holmes and Barrier as "Barriers," and the Memphis firm as "Barnwell and Hays."
Also in the late '70's these two firms engaged in a joint venture for the purchase and sale of "gin direct" cotton. A group of Mississippi cotton farmers in and around Yazoo County were contacted by the Barriers to sell their cotton under a "gin direct contract." Several thousand bales of cotton would be bought under these contracts. Barnwell and Hays marketed the cotton thus purchased. The advantage of this type of contract to the farmer was the ability to sell his cotton from the gin without having to store it in a compress, thereby avoiding storage charges.
Typically, the procedures were as follows: In the spring the Barriers contract for the purchase of a certain number of bales of cotton from the farmers at a cotton futures base price, less a point discount. Discount would also be made based upon the grade of cotton. Thus, a farmer entering a contract with the Barriers in March could choose the prevailing futures price for December cotton. The Barriers would agree to pay him at that price when delivered, less a set, agreed-upon discount. The contract was only with the Barriers and the farmer was never told there was another firm involved, or that this was a joint venture. Barnwell and Hays, however, was promptly notified when any contract was executed.
To hedge against market fluctuations, Barnwell and Hays, upon the execution of such a contract, usually purchased a futures contract to sell a certain number of bales of December cotton.
When the farmer delivered his bales to the gin in the fall, cotton samples would be taken for classing the cotton and the cotton would be loaded on trucks under bills of *303 lading which showed Barnwell and Hays as the owner and a designated cotton textile mill as the destination.
When the cotton was delivered to the mill, if the quality was acceptable the mill accepted the cotton and remitted a check to Barnwell and Hays. Occasionally, bales of cotton would be rejected and Barnwell and Hays would have to bear the expense of storing such rejected cotton until sold. Also, upon occasion the ginned cotton had to be stored for a brief period in a local compress.
Meanwhile, the cotton samples and class cards were sent to Greenwood where U.S. Department of Agriculture employees graded the cotton and wrote the grade on the class cards which were returned to the gin. In the fall of the year this usually took two to three weeks.
When the farmer got his class cards, he would take them to the Barriers' office in Yazoo City where an employee of the Barriers would work up an invoice showing the sale of the cotton to the Barriers; afterwards, the Barriers would make out a check to the farmer for the bales of cotton based upon the contract price per pound. On that same day the Barriers would notify Barnwell and Hays by telephone as to the purchase and the amount to transmit to the Barriers. Barnwell and Hays would then wire the requested amount to the Barriers' bank in Yazoo City to be deposited in the Barriers' general business checking account. The Barriers would request an excess of the amount paid the farmer in order to take care of commissions and U.S. government charges, usually amounting to a little over $2.00 per bale. Occasionally, Barnwell and Hays wired transfers to the Barriers for other purposes, such as the Barriers' share of profits derived from the joint venture. All checks to farmers in payment for cotton purchased under the gin direct contracts were paid out of the Barriers' general business checking account. This same account was used for all business transactions and payment of all business expenses.
Gin direct cotton contracts amounted to several million dollars yearly business for both of these firms; however, it was by no means all the cotton business engaged in by either of them. The Barriers also bought and sold thousands of bales of cotton in the conventional manner. As a result of these dealings, other cotton merchants also wire transferred funds into the Barriers' general business account.
In 1981 the local bank in Yazoo City merged with the Deposit Guaranty National Bank of Jackson ("DGB"). The Barriers were shareholders in the local bank and following the merger were also shareholders in DGB. DGB was interested in securing the Barriers' business. They not only wanted their deposits, but, more importantly, wanted to be their prime lender in all their cotton purchases. DGB actively solicited the Barriers' business and subsequently learned about the financial strength of the Barriers individually and of their firm, Holmes and Barrier. DGB also learned the Barriers' monetary needs in purchasing and selling cotton. The written information and discussions between officers of DGB and Jerry Barrier clearly revealed that no bank financing would be required in the gin direct cotton transactions. The Barriers only needed to borrow from DGB for the conventional cotton buying in which the Barriers engaged.

THE BANK'S DEALINGS
When DGB determined to solicit the Holmes & Barrier business in 1981, Stan Pratt and Stan Herren, DGB loan officers, made several trips to Yazoo City to find out about Holmes & Barrier's business operations.
There is no dispute that at these initial meetings Jerry Barrier and the Holmes & Barrier personnel told DGB about the joint venture with Barnwell & Hays and how it operated. Pratt summarized this information in a report included with the loan application filed with DGB:
In addition, Barrier has a joint venture with Barnwell & Hays, a Memphis merchant, whereby Barrier buys the cotton and ships it, and Barnwell & Hays sells the cotton, hedges the position with futures, finances the purchase and collects *304 the receivables. Barrier shares 50% of the profits. The joint venture presently has contracts to sell 14,800 bales, which are handled on a gin direct basis (gin to mill).
Herren learned the same things in 1981 about the joint venture. He knew the amount of cotton the joint venture was buying in 1982 from the Sartartia Gin. He also knew that Barnwell and Hays in Memphis financed the purchase of this gin direct cotton, knew Barnwell and Hays provided funds to pay for the gin direct cotton, knew that from time to time Barnwell and Hays wire transferred funds from Memphis to the Barriers' account in Yazoo City, and he knew that the Barriers actually issued the checks to the gin direct farmers from its account in Yazoo City.
Jerry Barrier testified as to what he told the bank during loan negotiations:
Q. Did you tell Deposit Guaranty National Bank about Barnwell and Hays?
A. Yes. The gin direct was described, that we did business with Barnwell and Hays, that we were a joint venture with them, that we did the buying of the cotton down here and they did the selling up there; we did the invoicing for the farmer here, we fixed the price for cotton when they wanted to call their price, and Barnwell and Hays [sic] responsibility was to provide the trucking and to collect for the cotton.
Q. Collect what?
A. Well, most important, to make the sales and then collect the proceeds for the cotton and to send that back down to us so that we could pay the farmer. That pretty much was the way the responsibilities of the gin direct was described.

Ernest Thomas, the Barriers' office manager, testified that though he could not remember the conversation verbatim, the wire transfers almost certainly were discussed during the meeting with DGB, and the bank officers were informed that the farmers would be paid by the Barriers by check.
In conventional buying when the Barriers bought cotton, ownership was evidenced by compress receipts on each bale of cotton in which DGB was given a security interest by a security agreement executed by the Barriers. Also, DGB was to be given physical possession of the receipts. The Barriers' loan was backed by these compress receipts. DGB extended the Barriers a $15 million line of credit, and on September 18, 1981, the barriers executed a $15 million master note to DGB and security agreements to secure this indebtedness to the bank. The security agreement specifically gave DGB the right to "appropriate and apply to any indebtedness secured hereby, whether or not then due, any monies now or thereafter held by Bank on deposit or otherwise to the credit or belonging to the debtor. ..." This same arrangement between DGB and the Barriers extended into 1982, except the line of credit was reduced from $15 million to $10 million.

ENTER SIMRALL
B.N. Simrall & Son, Inc. (Simrall), is a close corporation engaged in farming in Warren County. Its president is Newell Simrall III. Simrall was one of the farmers of a group which entered into gin direct contracts with the Barriers in 1982. On March 18, 1982, Simrall and the Barriers executed a gin direct contract for 1,000 bales of cotton (see appendix), which was orally amended on June 30 to add 300 bales. Also, on September 1 Simrall and the Barriers executed another gin direct contract for 500 bales of cotton. Simrall duly delivered his cotton to the Sartartia Gin for baling that fall, which was transported under bills of lading showing Barnwell and Hays as the owner. Upon receipt of class cards for 268 bales of cotton in late October, Newell Simrall delivered them to the Barriers' firm in Yazoo City and requested payment. An employee at the Barriers' prepared two invoices dated November 1, 1982, on Holmes & Barrier of Yazoo City letterhead, listing the bales of cotton, weight, and purchase price of each bought from "B.N. Simrall & Son." The total of *305 one of the invoices was $58,791.00 and the other $25,848.66.
On November 1 the Barriers mailed Simrall a check of the same date for $84,639.66 drawn on the Holmes & Barrier account of the Yazoo City branch of DGB. Also on that day by telephone the Barriers requested Barnwell and Hays to make a $119,896.73 wire transfer to their account. This covered the 268 bales of cotton purchased from Simrall and 100 bales from another farmer named Coker, plus additional charges. The funds were promptly wired by Barnwell and Hays describing it as a "transfer from Barnwell and Hays for credit of Holmes and Barrier." On November 2 the Barriers' account in Yazoo City was credited with the $119,896.73 deposit.
Simrall received the $84,639.66 check on Friday, November 3, and deposited it in his Vicksburg bank the following Monday, November 6.
During this time cotton prices dropped. DGB had by then become alarmed at the Barriers' financial condition, the status of several thousand compress receipts secured by the security agreement, and an overdraft of the Barrier firm at a Greenwood bank. On November 9 DGB offset the Barriers' deposit in the Yazoo City branch bank and applied it to the Barriers' indebtedness to DGB. When the $84,639.66 check to Simrall was presented to the Yazoo City branch bank for payment, it was not honored but was returned with a notation that the account had insufficient funds.
Simrall was not paid, and brought this suit against DGB in the Circuit Court of Yazoo County. The facts as above related were developed at trial. Newell Simrall acknowledged that in all of his dealings regarding the cotton contracts, they were solely with the Barriers' firm in Yazoo City, but that he understood the arrangement between the Barriers and Barnwell & Hays.
At the conclusion of trial DGB made a motion for a directed verdict. The circuit judge ruled as follows:
THE COURT:
There are two things definite that I have determined from the evidence and that is that we don't have a trust fund nor a special deposit. Neither of those theories have been established by any testimony and evidence that I've heard and, really to the contrary, I think it's been established there was neither. The only possibility that I can see of allowing this case to go to the jury, is either some theory of constructive trust or conversion. I will allow it to go to the jury on either of those theories and we're going to start with the plaintiff's instructions.

LAW
Simrall & Son dealt throughout with the Barriers, the firm of Holmes & Barrier of Yazoo City. But Barnwell & Hays remained pivotal. The wire transfer for $119,896.73 did not attempt to specially designate the use of the funds beyond being deposited to the credit of the Holmes & Barrier account in Yazoo City. There is no dispute in the proof, however, that this particular transfer was intended to cover Simrall's check and was made for this express purpose. Simrall was not paid, and obviously is still due the sales price of its cotton from the joint venture.
The Holmes and Barrier account with DGB was a general business account, used by the firm in the usual course of its business. It is well settled that funds deposited to a general account belong to the bank, with the bank becoming a debtor to the owner of the account for the amount on deposit. Deposit Guaranty Bank & Trust Co. v. Merchants' Bank & Trust Co., 171 Miss. 553, 158 So. 136 (1934); Deer Island Fish & Oyster Co. v. First National Bank, 166 Miss. 162, 146 So. 116 (1933); Moreland v. Peoples Bank of Waynesboro, 114 Miss. 203, 74 So. 828 (1917). As was stated by the U.S. Supreme Court in Davis v. Elmira Savings Bank, 161 U.S. 275, 288, 16 S.Ct. 502, 505, 40 L.Ed. 700, 702 (1896): "The deposit by a customer with his banker is one of loan, with the superadded obligation that the money is to be paid when demanded by a check."
*306 It is equally well settled that a bank, under a "set off" principle, has the right to apply a debtor's deposit to payment of his debt then due, aside from any security agreement specifically authorizing it to do so. In Moreland v. Peoples Bank, supra, we stated:
It is well settled that the bank itself has a right, if it so desires, to apply whatever amount the maker of the note has on deposit with it to a payment on the note. Or, in other words, the bank itself has the right to set off the amount it owes the depositor against the amount owed it by the depositor. The relation existing between a bank and a depositor is simply one of debtor and creditor.
114 Miss. at 211-12, 74 So. at 829-30. The right of set-off exists even if a bank's indebtedness is secured by collateral pursuant to a security agreement. Duncan v. Coahoma Bank, 397 So.2d 891 (Miss. 1981).
As to a third party with an outstanding check against the account, but which he has not presented for payment when the bank exercises its right of set-off, in Citizens National Bank v. First National Bank, 347 So.2d 964, 968 (Miss. 1977), this Court stated:
It is now, and has been for a long time, the law in this State that the relationship between a bank and its depositors is one of debtor and creditor. Since it is a debtor-creditor relationship, the giving of a check by a depositor does not constitute an assignment of the funds on deposit. The bank may refuse to pay the check, although the depositor has sufficient funds to his credit to cover the check and the holder of the check has no cause of action against the bank. The holder of the check must look to the drawer of the check and only the drawer of the check can complain about the bank not honoring the check.

See also Miss. Code Ann. § 75-3-409; J.B. Ehrsam & Sons Mfg. Co. v. Guaranty National Bank & Trust Co., 158 Colo. 84, 404 P.2d 844, 847 (1965); Steinbrecher v. Fairfield County Trust Co., 5 Conn.Cir. 393, 255 A.2d 138, 143 (1968); Conn. v. Bank of Clarendon Hills, 53 Ill.2d 33, 289 N.E.2d 425, 428 (1972).
However, this right of set-off does not extend to funds that a bank knows belongs to a third person.
I emphasize that knowledge constitutes the hinge upon which this case turns. It is by now well established that when a bank has knowledge of a trust, special deposit, or some other type of fiduciary relationship between its depositor and a third person, the bank cannot set off such funds against its depositor's indebtedness, and that the bank may be required to restore funds that the bank knew was not owned by its depositor. We set out this principle in Lumberton State Bank v. Fortenberry, 222 So.2d 384 (Miss. 1969). In Fortenberry, sellers of cattle had their checks dishonored because the bank offset the account. While the stockyard owner successfully maintained that the funds belonged to the cattle sellers, this Court stated:
There is no doubt that the shippers who had been issued checks for their cattle drawn on this account could have brought an action and recovered against the bank.
Fortenberry, 222 So.2d at 387. It is true that in Fortenberry the stockyard owner maintained both a general account and a custodial account for proceeds from the sale of livestock from which the shippers would be paid; however, the bank was allowed to debit the custodial account on occasion to cover checks drawn on a personal account and then replace the funds by depositing money in the custodial account derived from sources other than the sale of livestock. This Court stated that this practice of manipulating funds between the general account and custodial account
did not affect the funds which were deposited in the account just prior to the time the bank seized the trust fund [to offset overdrafts from the general account]. The bank was well aware that these funds were proceeds from the sale of livestock.

Fortenberry, 222 So.2d at 387. [emphasis added]
*307 The Fortenberry opinion did not turn upon the kind of account into which the funds were deposited, but rather upon the bank's knowledge of the nature of the particular funds deposited upon a particular day  "The bank knew that the particular funds seized on June 26 did not belong to Fortenberry and that is controlling." Id. at 388. [emphasis added]
I again emphasize the bank's knowledge as controlling in a case similar to this one in Central Bank of Mississippi v. Butler, 517 So.2d 507 (1987). In that case, Central Mississippi Livestock Exchange (CMLE) sold livestock for the owners, depositing sales proceeds into a general account with Central Bank of Mississippi (CBM). These funds were then transferred, by prior arrangement with the bank, to CMLE's custodial account to cover the checks written by CMLE to the sellers of the livestock. Butler, 517 So.2d at 508. At one point, CBM took sale proceeds from the general account to cover an overdraft on CMLE's owner's personal account. "The end result was that the money paid by livestock buyers for the seller's cattle was kept by the bank instead of remitted to the sellers." Id. at 509. In Butler we pointed out that under federal law, payments made for livestock are trust funds. Packers & Stockyards Act, 7 U.S.C.A. §§ 181-229 (1980). Even though the funds were initially deposited into the general account, and even though the set-off was taken from the general account, there was proof in the record that the bank had knowledge of the nature of these funds  they were livestock payments owed by CMLE to the sellers. The knowledge that the funds did not belong to CMLE precluded the bank from using the funds to offset the depositor's debt. "It is the nature of the funds, not the name of the account, that controls whether the funds may be set off." Butler, 517 So.2d at 511.
The record is undisputed that the bank in the present case, DGB, knew, when it negotiated with the Barriers to become the prime lender for their cotton purchases, that Barriers was a joint venturer with Barnwell & Hays in its gin-direct business. Furthermore, DGB knew the procedures between the joint venturers: that Barnwell & Hays financed the purchase of gin direct cotton; that Barnwell & Hays provided funds to pay for gin direct cotton; that Barnwell & Hays wired transferred funds from Memphis to the Barriers account in Yazoo City; that Barriers actually issued checks from the wired transfers to the gin direct farmers. It is also undisputed that the $15 million, and later $10 million, credit line extended to Barriers was secured by Barriers' conventional cotton sales, not by any gin direct sales. Yet, DGB took funds wired by Barnwell & Hays to Barriers' account for payment to gin direct farmers to offset Barriers' other debts with DGB.
DGB makes much of the fact that the wire transfers from Barnwell & Hays were not denoted as special deposits for gin direct payments and did not go into a special account or trust account. Again, we emphasize that it is the nature of the funds, not the name of the account, that controls, as well as the fact that DGB knew the wire transfers belonged to the gin direct farmers and not to the Barriers.
The trial judge directed a verdict in favor of the bank on the issues of whether the wire-transferred money was a trust fund or a special deposit. In this he was no doubt correct, for the facts do not bring this case neatly under either theory. There was no statutory or regulatory trust imposed on these funds, as in Butler. The trial judge did allow the case to go to the jury under "some theory of constructive trust or conversion." In this he was infinitely correct. For though this case does not present facts bringing it firmly within either rule, still there are elements of each which, when amalgamated, created a jury question which was resolved in Simrall's favor.
The fact that the trial judge couched his decision in terms of "conversion" or "constructive trust" means little in this context, because he submitted the issue which the jury had to decide in order to award Simrall a judgment. The court's instruction required the jury to find that the Barriers held the wire-transferred money in trust and that DGB knew of the trust character of the funds.
*308 Simrall and his fellow cotton farmers are no differently situated than the cattlemen in Butler or the livestock owners in Fortenberry. A jury could have found that in reality the Barriers held the proceeds from reselling the gin direct cotton as a fiduciary for the farmers. The jury could have found these funds were "trust" funds in fact, and that is exactly what the jury did. Barnwell and Hays normally received payment for reselling the gin direct cotton days before it had to pay the cotton farmers. Barnwell and Hays kept thorough records of the gin direct funds so that it could pay the farmers when due. Both the Barriers and Barnwell and Hays treated the money as though it belonged to someone else, acknowledging the existence of a fiduciary relationship.
No one suggests the absence of a jury issue concerning the second element  DGB's knowledge of the trust. As related in the facts, DGB was well acquainted with the joint venture and the gin direct operation. Certainly, sufficient proof showed the Bank had knowledge of this special arrangement for gin direct cotton and knew the wire transfers from Barnwell and Hays were for paying cotton farmers. Though the bank may not have known this particular transfer of $119,896.73 was directly intended for Simrall and the other farmer, it knew the money was intended for farmers such as Simrall, putting them on notice it could not offset the amount of this transfer.
Having had sufficient facts upon which to find a trust-type deposit, and having had sufficient proof that DGB with knowledge of the trust-type nature of these funds nevertheless seized the funds to apply against another debt, the jury was justified in finding DGB liable to Simrall. Where there is sufficient evidence to undergird the jury's verdict, it is beyond our scope of review to disturb it. See e.g., Bell v. City of Bay St. Louis, 467 So.2d 657, 660 (Miss. 1985); Stong v. Freeman Truck Line, Inc., 456 So.2d 698, 708 (Miss. 1984). City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983). Therefore, I would affirm the judgment of the lower court.