**DOWNRIVER COMMUNITY FEDERAL CREDIT UNION, Plaintiff–Appellant,**

v.

**PENN SQUARE BANK, through its Receiver, FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Appellee.**

**WOOD PRODUCTS CREDIT UNION, Plaintiff–Appellant/Cross–Appellee,**

v.

**PENN SQUARE BANK, through its Receiver, FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant–Appellee/Cross–Appellant.**

Nos. 87–1648, 87–1649 and 87–1707.

United States Court of Appeals,
Tenth Circuit.

July 3, 1989.

Thomas S. Dann, of Timothy D. Naegele
& Associates, Washington, D.C., and Rob-

ert A. Wiener, of Weinberg, Zipser, Arbiter, Heller & Quinn, Los Angeles, Cal. (Timothy D. Naegele, of Timothy D. Naegele & Associates, Washington, D.C., and C. Alexander Hewes, Jr., of Hewes, Morella, Gelband & Lamberton, Washington, D.C., with them, on the briefs), for plaintiffs-appellants.

Ann S. DuRoss (Donald B. McKinley, Regional Counsel, and Jane Rossowski, of Federal Deposit Ins. Corp., Washington, D.C., and Ronald N. Ricketts, of Gable & Gotwals, Tulsa, Okl., with her, on the briefs), Asst. Gen. Counsel, of Federal Deposit Ins. Corp., Washington, D.C., for defendant-appellee.

Before McKAY, and TACHA, Circuit Judges, and O'CONNOR, District Judge.[*]

TACHA, Circuit Judge.

This appeal arises from a dispute between certain uninsured depositors in the insolvent Penn Square Bank, N.A. (PSB), and the Federal Deposit Insurance Corporation (FDIC), in its capacity as receiver, over the priority of the depositors' claims against the insolvent bank's assets. The district court found that PSB fraudulently induced the plaintiffs to deposit funds through issuing financial statements that were materially misleading as to PSB's financial condition. In the remedy phase of the trial, the district court imposed a constructive trust upon PSB's assets in favor of the plaintiff-depositors, thereby entitling them to recover the full amount of their deposits, rather than their pro rata share under the relevant provision of the National Bank Act, 12 U.S.C. § 194. We hold that federal law limits these depositors' recovery to their pro rata share of the assets held by the receiver, and reverse.

## I.

The plaintiffs, Downriver Community Federal Credit Union (Downriver) and Wood Products Credit Union (Wood Prod-

ucts), were among the 140 credit unions, 48 savings and loans, and 47 commercial banks holding substantial uninsured deposits in PSB when the Comptroller of the Currency ordered PSB closed on July 5, 1982. *See Penn Square Bank Failure: Hearings Before the House Comm. on Banking, Finance and Urban Affairs*, 97th Cong., 2d Sess., pt. 2, at 271 (1983). Like many other credit unions, Wood Products and Downriver had purchased certificates of deposit in PSB relying in part upon recommendations and financial information provided by money brokers, "the middlemen in the CD market whose fees were paid not by the credit unions, but by Penn Square." *Id.* at 267.

In December 1981 Downriver was solicited by First United Fund (FUF), a money broker located in Garden City, New York, that claimed to perform a "complete financial analysis" of all banking institutions that it represented. Downriver purchased its first PSB certificate of deposit on April 1, 1982, in reliance upon financial information that FUF provided over the telephone. FUF later provided Downriver with PSB's financial statements, prepared by PSB's accountants, Peat, Marwick, Mitchell & Co. (PMM), and Downriver purchased additional certificates of deposit in reliance upon the information contained therein. On the date that the Comptroller of the Currency closed PSB, Downriver held over $4 million in PSB certificates of deposit. The FDIC paid Downriver deposit insurance of $100,000 and issued a receiver's certificate for the uninsured balance of $3,938,240. As of December 10, 1986, Downriver had received dividend payments on that receiver's certificate totaling $2,166,031.42.

Wood Products similarly purchased a PSB certificate of deposit in reliance upon information provided by a money broker, Professional Asset Management, Inc. (PAM). PAM provided a list of financial institutions in which to invest and produced a "Capital Adequacy Report" reflecting the financial condition of each of those institu-

[*] The Honorable Earl E. O'Connor, Chief Judge, United States District Court for the District of Kansas, sitting by designation.

tions. Financial information provided by the institutions that PAM represented formed the basis for those reports. After analyzing the financial information contained in the report on PSB, Wood Products purchased a $500,000 PSB certificate of deposit on June 14, 1982. Upon PSB's closure, Wood Products received federal deposit insurance of $100,000 and a receiver's certificate covering the uninsured balance of $404,583.32. As of December 10, 1986, Wood Products had received dividends upon its receiver's certificate totaling $222,520.82.

As noted by the district court, the "calamitous event" of the closing of PSB generated many lawsuits against PSB, its officers, directors, and accountants, and the money brokers responsible for soliciting funds for the bank. Both Downriver and Wood Products commenced suits in the United States District Court for the Western District of Oklahoma, claiming in part that PSB knowingly or recklessly induced their deposits through issuing financial statements that materially mistated the bank's financial condition. Those suits were consolidated with suits filed by several other parties who eventually settled during the trial, leaving only the claims of Downriver and Wood Products.

The case was tried in several phases, two of which are most relevant to this appeal. The first phase involved primarily the factual issue of whether PSB had fraudulently misrepresented its financial condition in its financial statements, and whether the plaintiffs had relied upon those misrepresentations in purchasing certificates of deposit in PSB. Downriver's claim was tried to the jury, and Wood Products' claim was tried to the court. In both cases, the trier of fact returned verdicts in favor of the plaintiffs, finding that PSB's December 31, 1981, and March 31, 1982, financial statements contained material misrepresentations; such misrepresentations were relied upon by the plaintiffs; and PSB's management and directors knew that those financial statements contained false or misleading information, or recklessly made those representations knowing that there was no reasonable ground for believing they were true.

The second phase of the trial involved remedy questions: whether a constructive trust could be imposed upon the assets held by the receiver, and, if so, whether such a constructive trust should include the post-insolvency interest that the receiver earned on the plaintiffs' deposits.[1] The district court held that Oklahoma law, rather than federal law, governed whether a constructive trust could be imposed. Although the relevant provision of the National Bank Act, 12 U.S.C. § 194, requires ratable distribution among holders of receiver's certificates, the district court held that this provision did not "preclude identification and recovery of property that does not rightfully belong to the bank."

The district court found that the plaintiffs had satisfied the factual and legal prerequisites for imposition of a constructive trust under Oklahoma law: PSB had obtained the plaintiffs' deposits by fraud; such deposits had augmented PSB's assets; and the deposits could be traced into assets held by the receiver.[2]

1. Downriver had also asserted a claim for a constructive trust on the proceeds of one of its certificates of deposit that had matured on July 2, 1982, the last banking day on which PSB was open. Downriver's money broker, FUF, had issued wiring instructions to PSB to send the funds from the matured certificate to another bank, but the funds were not wired and remained in the bank on July 5, 1982, the date the Comptroller of the Currency closed PSB and appointed a receiver. The jury found that FUF was negligent in its attempt to have the funds wired, but rejected Downriver's allegation that PSB was guilty of fraud in failing to wire the funds. The court also rejected Downriver's theories that the proceeds constituted a segregated fund, and that PSB became its agent and breached a fiduciary duty in failing to transfer the funds. The district court therefore denied Downriver's plea for a constructive trust on the proceeds of the wire transfer. Downriver apparently does not appeal this aspect of the district court's decision.

2. The district court found no Oklahoma cases discussing the augmentation and tracing requirements. The court noted, however, that because other jurisdictions imposed such requirements on parties seeking a constructive trust, see, e.g., *Converse Rubber Co. v. Boston–Continental Nat'l Bank*, 12 F.Supp. 887, 890 (D.Mass. 1935), aff'd, 87 F.2d 8 (1st Cir.1936), Oklahoma

The court also found that the imposition of a constructive trust would be equitable. First, the court noted that recovery by the plaintiffs would have only minimal impact upon the assets available to other uninsured depositors holding receiver's certificates. Second, the court noted that imposing a constructive trust in favor of the plaintiffs was not unfair to other uninsured depositors because other depositors could have brought similar claims on their own or intervened in the present case.

The district court therefore imposed a constructive trust on the assets held by the receiver to the extent of the principal amount of the deposits and interest accrued to the date of insolvency. The court denied the plaintiffs' claim for a constructive trust on the postinsolvency interest that the receiver earned on the plaintiffs' deposits, however, holding that federal law governed the distribution of interest accruing on a claim after insolvency of a national bank and that payment of interest on one claim while other claims remained unpaid in whole or in part would violate the requirement of ratable distribution of assets.

Although neither party challenges the district court's factual findings, both the plaintiffs and the FDIC contend that the court made legal errors. The plaintiffs contend that the district court erred in denying their claim for postinsolvency interest. The FDIC contends that the court erred in imposing a constructive trust for any amount of the plaintiffs' deposits, arguing that an imposition of a constructive trust in this case is a preference contrary to certain provisions of the National Bank Act, 12 U.S.C. §§ 91, 194. Because we agree with the FDIC that a constructive trust may not be imposed in this case, we do not reach the question of whether an award of postinsolvency interest is permissible.

## II.

■ Although an award of equitable relief is generally reviewed only for an abuse of discretion, *see McKinney v. Gannett*

could be expected to impose similar require-

*Co.*, 817 F.2d 659, 670 (10th Cir.1987), we review de novo the district court's judgment when, as here, the availability of such equitable relief depends upon an interpretation of law, *see Pratte v. NLRB*, 683 F.2d 1038, 1040 (7th Cir.1982). In deciding the question of whether a constructive trust may be imposed in this case, the first issue to be resolved is the source of the applicable law.

■ Prior to the insolvency of a national bank, state law generally governs the nature of the relationship between a national bank and its depositors. *See Reno Nat'l Bank v. Seaborn*, 99 F.2d 482, 483 (9th Cir.1938).

> The creditor rights of a depositor of a national bank, by virtue of his loan to the bank and the effects of the conduct of the bank as altering such rights, are determined by the law of the state of the deposit, in the absence of a federal statute creating a different relationship. There is no underlying general federal law determining such rights (*Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487), and no federal statute denying to a cestui his right against a bank as its trustee, where, in the course of its business prior to the receivership, such a trust relationship has been created by the conduct of the bank.

*Id.* The parties' intention is critical in determining whether a relationship of debtor and creditor, or trustee and beneficiary, has been established by depositing funds in a national bank. *See Blakey v. Brinson*, 286 U.S. 254, 261–62, 52 S.Ct. 516, 517–18, 76 L.Ed. 1089 (1932).

■ State law governance of the preinsolvency contracts of national banks is limited, of course, by the paramount authority of Congress to regulate national banks. National banks are instrumentalities of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or

ments.

control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the federal government to discharge the duties for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court.

*Davis v. Elmira Sav. Bank,* 161 U.S. 275, 283, 16 S.Ct. 502, 503, 40 L.Ed. 700 (1896); *see id.* at 290, 16 S.Ct. at 506 ("general and undiscriminating state laws" govern contracts of national banks "so long as such laws do not conflict with the letter or the general objects and purposes of congressional legislation").

▮ Although Congress has not enacted specific legislation to govern the preinsolvency relationship between national banks and their depositors, Congress has enacted legislation governing the distribution of assets upon the insolvency of a national bank. Most relevant here are provisions of the National Bank Act precluding payments by the bank that prefer some creditors over others, 12 U.S.C. § 91,[3] and requiring a ratable distribution of assets among all general creditors entitled to share in the receivership estate, 12 U.S.C. § 194.[4] As of the moment that a national bank is declared insolvent and goes into the hands of a receiver, federal law governs the distribution of the bank's assets. *See*

*American Surety Co. v. Bethlehem Nat'l Bank,* 314 U.S. 314, 316–17, 62 S.Ct. 226, 227–28, 86 L.Ed. 241 (1941); *First Nat'l Bank v. Selden,* 120 F. 212, 215 (7th Cir. 1903). All state laws inconsistent with the "system of equal distribution" established by the National Bank Act are preempted. *Jennings v. United States Fidelity & Guar. Co.,* 294 U.S. 216, 226, 55 S.Ct. 394, 398–99, 79 L.Ed. 869 (1935). "In no other way could there be unity of administration, and a carrying out of the federal mandate of equality." *Selden,* 120 F. at 215. As the Supreme Court has noted:

> We consider [the National Bank Act] as constituting by itself a complete system for the establishment and government of national banks, prescribing the manner in which they may be formed ... and the manner ... in which their affairs shall be wound up, their circulating notes redeemed, and other debts paid, or their property applied toward such payment.

*Cook County Nat'l Bank v. United States,* 107 U.S. 445, 448, 2 S.Ct. 561, 564, 27 L.Ed. 537 (1883).

▮ When, as here, the FDIC is involved in its capacity as receiver, we must also read the National Bank Act in conjunction with the Federal Deposit Insurance Act. *FDIC v. McKnight,* 769 F.2d 658, 662 (10th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986). The FDIC is empowered by statute "[t]o sue and be sued." 12 U.S.C. § 1819 (Fourth). The statute further provides that "[a]ll

---

3. Section 91 provides in relevant part:

   All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void....

12 U.S.C. § 91.

4. Section 194 provides:

   From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the comptroller shall make a *ratable dividend* of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such association, or their legal representatives, in proportion to the stock by them respectively held.

suits of a civil nature at common law or in equity to which the [FDIC] shall be a party shall be deemed to arise under the laws of the United States." *Id.;* [5] *see D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 467–68, 62 S.Ct. 676, 683–84, 86 L.Ed. 956 (1942) (Jackson, J., concurring); *FDIC v. Braemoor Assocs.,* 686 F.2d 550, 553 (7th Cir. 1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983). Upon the insolvency of a national bank and appointment of the FDIC as receiver, therefore, it is well settled that all claims against the receiver's estate are governed by federal law. *See, e.g., FDIC v. Bank of San Francisco,* 817 F.2d 1395, 1398 (9th Cir.1987); *FDIC v. Palermo,* 815 F.2d 1329, 1334 (10th Cir.1987); *Interfirst Bank Abilene, N.A. v. FDIC,* 777 F.2d 1092, 1094 (5th Cir.1985); *McKnight,* 769 F.2d at 661; *Selden,* 120 F. at 215.

■ The plaintiffs attempt to avoid the application of federal law to their claim, however, on the ground that their equitable right to the funds arose prior to insolvency. They contend that Oklahoma law governs the nature of their preinsolvency relationship with PSB, and that, because of PSB's fraud, their deposits never became part of PSB's assets, but were instead impressed with a trust relating back to the date of their initial deposits. The equitable fiction of the trusts relating back to the date that the plaintiffs deposited funds in PSB, however, does not change the fact that by purchasing a certificate of deposit in PSB, the plaintiffs intended a debtor and creditor relationship. *See Atlantic Gypsum Co. v. Federal Nat'l Bank,* 76 F.2d 59, 60 (1st Cir.1935) ("Deposits with national banks, evidenced by a certificate of deposit, are ordinarily made on the credit of the bank, and create only a debtor and creditor relation.") Although the state law of contracts governs whether the parties intended to form a trust or a debtor/creditor relationship prior to insolvency, any attempt to recharacterize that relationship equitably after insolvency is governed by federal law.[6]

■ The FDIC, as receiver, takes control of an insolvent national bank subject to the "rights and equities" existing prior to insolvency. *Palermo,* 815 F.2d at 1334. The relevant provisions of the National Bank Act admittedly do not provide explicit guidance for the disposition of all claims against the receiver's estate. *See D'Oench, Duhme & Co.,* 315 U.S. at 470, 62 S.Ct. at 685. (Jackson, J., concurring)

12 U.S.C. § 194 (emphasis added).

5. Section 1819 creates an exception to this provision for "any ... suit to which [FDIC] is a party in its capacity as receiver of a *State* bank and which involves only the rights or obligations of depositors, creditors, stockholders, and such State banks under State law." 12 U.S.C. § 1819 (Fourth) (emphasis added). That exception is not this case.

6. The plaintiffs rely upon *Reno Nat'l Bank v. Seaborn,* 99 F.2d 482 (9th Cir.1938), for the proposition that state law determines whether a trust relationship arose prior to insolvency. In *Seaborn,* the Ninth Circuit considered whether the conduct of a national bank prior to insolvency converted the plaintiff's deposit into a trust fund. *Id.* at 483. The plaintiff, the receiver of a failed state bank, sought to establish that its deposit in a national bank was transformed into a trust fund when the national bank promised to transfer the receiver's funds to another state bank, but failed to do so prior to becoming insolvent. *Id.* at 482–83. The question before the court concerned the legal effect of an instruction to transfer funds, and the court held that state law governed this question. *Id.* at 483. "No need of federal uniformity exists requiring that federal banks in each state shall conduct their ordinary banking business exactly as in every other state." *Id.* After examining the plaintiff's instruction to transfer the funds, and the bank's agreement to do so, the court concluded that no trust had been established. *Id.* at 484. The plaintiff's credit balance at the bank was not segregated into a separate fund and was still subject to the receiver's check. *Id.* The debtor and creditor relationship was still intact, and no trust had been established by the plaintiff's order. *See id.* Instead of full recovery, the plaintiff merely had a claim to a pro rata share in the distribution of the national bank's assets. *See id.* at 483.

To the extent that *Seaborn* is interpreted to have applied state law to determine whether the parties intended a trust to be formed, or whether the bank created a trust by segregating the plaintiff's funds, it is consistent with our analysis. To the extent that *Seaborn* may be interpreted as support for the position that equitable claims against the receiver's estate are governed only by state law, we disagree. As discussed more fully in part III of this opinion, we may choose to adopt state law as the rule of decision, but we need not do so when a conflict with the purposes of the National Bank Act would result.

(noting "recognized futility of attempting all-complete statutory codes"). "Congress has seen fit not to anticipate by specific rules solution of problems that inevitably arise in national bank liquidations." *Bethlehem Nat'l Bank*, 314 U.S. at 316, 62 S.Ct. at 228. "Instead, [Congress] chose achievement of a 'just and equal distribution' of an insolvent bank's assets through the operation of familiar equitable doctrines evolved by the courts." *Id.* (quoting *Elmira Sav. Bank*, 161 U.S. at 284, 16 S.Ct. at 504). Federal common law governs the application of such equitable doctrines. *See FDIC v. Mademoiselle of Cal.*, 379 F.2d 660, 662–63 (9th Cir.1967).

### III.

Having decided that federal common law governs the plaintiffs' claims does not necessarily preclude the application of Oklahoma law allowing a constructive trust remedy. "In fashioning the federal common law in this area we may look for guidance to the law of the state having the closest connection to the transaction at issue when to do so would not conflict with the need for uniform rules governing bank liquidations." *Palermo*, 815 F.2d at 1334.

When a "federal policy or need for uniformity" would be "frustrated" by the application of state law as the federal rule of decision, *Palermo*, 815 F.2d at 1334–35, however, we must devise from sources other than state law our own principles that conform with that policy or need. *See id.; see also Bank of San Francisco*, 817 F.2d at 1398 (noting that federal court making "'specialized federal common law'" may "adopt the law of the state involved" or "draw on the federal law merchant" (quoting Friendly, *In Praise of Erie—And of the New Federal Common Law*, 39 N.Y.U.L. Rev. 383, 406 (1964))); *Braemoor Assocs.*, 686 F.2d at 554 (suggesting that "in an appropriate case a federal court could reject state substantive law if ... necessary to protect the FDIC's interest in minimizing depositor losses"). As Justice Jackson stated:

> A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law....
>
> ... [The substantive issue here] is not a question to be answered from considerations of geography. That a particular state happened to have the greatest connection in the conflict of laws sense with [the activity forming the basis of the claim] is not enough to make us subservient to the legislative policy or the judicial views of that state.

*D'Oench, Duhme & Co.*, 315 U.S. at 471–73, 62 S.Ct. at 686–87 (Jackson, J., concurring) (footnote omitted); *cf. Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (noting preemption of state law when "the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress").

Here, we must utilize governing principles that are in conformity with the policies underlying the National Bank Act. *See Palermo*, 815 F.2d at 1334. Most important to this case are the policies of achieving the "equity of equality among creditors," *Scott v. Armstrong*, 146 U.S. 499, 511, 13 S.Ct. 148, 152, 36 L.Ed. 1059 (1892), and of the orderly liquidation of the receiver's estate, *see Bryant v. Linn County, Or.*, 27 F.Supp. 562, 565 (D.Or.1938), that are implicit in 12 U.S.C. §§ 91, 194.

■ Congress chose to achieve, through the National Bank Act, "a just and

equal distribution of the assets of national banks among all unsecured creditors." *Elmira Sav. Bank,* 161 U.S. at 284, 16 S.Ct. at 504. "This public aim in favor of all the citizens of every state of the Union is manifested by the entire context of the national bank act." *Id.* "The FDIC, when acting as a receiver for an insolvent bank, cannot prefer some creditors over others; rather, all creditors must share in a ratable distribution of the insolvent bank's assets." *Hibernia Nat'l Bank v. FDIC,* 733 F.2d 1403, 1407 (10th Cir.1984). The receiver is charged with the duty of "securing equal justice to all its creditors ... under a law which sternly forbids preferences." *Casey v. Cavaroc,* 96 U.S. 467, 489, 24 L.Ed. 779 (1878). The National Bank Act is "distinctly unfriendly to the recognition of special interests or preferred claims. Doubts should be resolved against them." *Atlantic Gypsum,* 76 F.2d at 61 (citations omitted).

The Act's unfriendliness to special interests requires a claimant seeking a preference from pro rata distribution of assets to bear a heavy burden of proof. *See Hibernia Nat'l Bank,* 733 F.2d at 1408; *see also Bryant,* 27 F.Supp. at 565 ("[a]s a matter of orderly liquidation in accordance with [the Act]" federal courts uniformly put burden on claimant seeking preference based on trust arising *ex maleficio*). A national bank's fraudulent conduct may give rise to a constructive trust only when the plaintiff can show that the bank's fraud caused a particular harm that is not shared by substantially all other depositors, and that granting relief to the plaintiff does not disrupt the orderly administration of the receiver's estate. This general rule is exemplified in the cases involving constructive trusts imposed upon the assets of a hopelessly insolvent bank.

A bank receiving deposits after its officers know that the bank is hopelessly insolvent is deemed to commit fraud upon those depositors, entitling them to reclaim their deposits.[7] *See, e.g., St. Louis & S.F. Ry. v. Johnston,* 133 U.S. 566, 576–77, 10 S.Ct. 390, 392–93, 33 L.Ed. 683 (1890); *Carnegie–Illinois Steel Corp. v. Berger,* 105 F.2d 485, 487 (3d Cir.), *cert. denied,* 308 U.S. 603, 60 S.Ct. 140, 84 L.Ed. 504 (1939); *Standard Oil Co. v. Elliott,* 80 F.2d 158, 161 (4th Cir.1935); *Federal Reserve Bank v. Omaha Nat'l Bank,* 45 F.2d 511, 519 (8th Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 215, 75 L.Ed. 794 (1931). This right to reclaim is restricted to claimants who deposited funds *after* the date the bank is known by its officers to be hopelessly insolvent, and it extends only to "the sum paid in" at such time. *Berger,* 105 F.2d at 487. "[M]ere embarrassed circumstances, or even simple insolvency of a bank at the time of receiving a deposit, without more, does not warrant the rescission, for fraud, of the contract of deposit, if, when the deposit was accepted, there was a present genuine and reasonably founded hope, expectation, and intention on the part of the bank's officers to carry on the business." *Byrd v. Ross,* 58 F.2d 377, 378 (S.D.Fla.1932). If the bank's officers have "ground for the supposition that the bank might continue in business," *Johnston,* 133 U.S. at 578, 10 S.Ct. at 393, and merely omit to disclose the precarious financial condition of the bank, a constructive trust is not available. *See id.*

Those who deposit funds after a bank is hopelessly insolvent can show a specific act of fraud that affects only them, and therefore they have a superior equitable position over others who deposited funds prior to hopeless insolvency with a hope or belief in the bank's future ability to repay the deposit. Furthermore, a hopelessly insolvent bank should have been closed by the Comptroller of the Currency as of the date of such insolvency, thereby preventing the receipt of further deposits. Equity therefore "regards that as done which should have been done," *O'Neal v. White,* 79 F.2d 835,

---

7. As in other cases involving the recovery of a trust fund, the right to reclaim a deposit is contingent upon the plaintiff's proof that the deposit augmented the receiver's estate and can be traced into the possession of the receiver.

*See Queenan v. Mays,* 90 F.2d 525, 531–32 (10th Cir.), *cert. denied,* 302 U.S. 724, 58 S.Ct. 45, 82 L.Ed. 559 (1937); *Flynn v. Smith,* 90 F.2d 305, 310–11 (7th Cir.1937); *Kershaw v. Jenkins,* 71 F.2d 647, 649 (10th Cir.1934).

835 (4th Cir.1935), *cert. denied,* 297 U.S. 706, 56 S.Ct. 501, 80 L.Ed. 994 (1936), and permits the rescission of deposit contracts made after the bank should have been closed.

■ Even in the case of hopeless insolvency, however, full restitution may be denied when it would sufficiently disrupt the orderly administration of the receiver's estate or otherwise result in inequitable treatment to other similarly situated depositors. *See Bryant,* 27 F.Supp. at 565. In *Bryant,* the court refused a claim for a constructive trust by a party which had deposited funds in a national bank that had been insolvent "for many years." *Id.* at 563. That party, as well as many other depositors who were not parties to the suit, had made such deposits "upon the faith of the solvency of the Bank." *Id.* Because the complaining party did not "assert the claim of trust ex maleficio until almost twenty-three months after the closing of the Bank," and because virtually all other depositors could have been considered in the same situation due to the unusual length of time that the bank was hopelessly insolvent, the court denied a constructive trust. *See id.* at 565–66; *see also Berger,* 105 F.2d at 487–88 (denying constructive trust due to delay in bringing claim when allowing claim "would work havoc in the orderly administration" of bank's affairs); *Leonard v. Gage,* 94 F.2d 19, 25–26 (4th Cir.), *cert. denied,* 303 U.S. 653, 58 S.Ct. 752, 82 L.Ed. 1113 (1938) (allowing recovery in favor of receivers of national banks against receivers of state bank when relief could be awarded "without disrupting in any way the orderly administration of the estate or prejudicing the just rights of any of the creditors"); *Poole v. Elliott,* 76 F.2d 772, 774–75 (4th Cir.1935) (denying constructive trust upon assets of insolvent state bank when claim "would affect a large part of the obligations to depositors and probably all of the cash assets passing into the hands of the receivers" and cause "injustice to other persons interested in the administration of the estate").

■ Here, the application of these policies—preserving the orderly administration of the receiver's estate and achieving an equitable distribution among creditors—is not a question to be decided fortuitously because "a particular state happened to have the greatest connection in the conflict of laws sense." *D'Oench, Duhme & Co.,* 315 U.S. at 473, 62 S.Ct. at 687 (Jackson, J., concurring). We refuse here to adopt Oklahoma law as the federal rule of decision because to do so would permit a constructive trust in favor of plaintiffs in contravention of the principles implicit in the National Bank Act.

In awarding a constructive trust in favor of the plaintiffs, the district court relied upon an Oklahoma statute providing that:

> [o]ne who practices a deceit with intent to defraud the public, or a particular class of persons, is deemed to have intended to defraud every individual in that class, who is actually misled by the deceit.

Okla.Stat.Ann. tit. 76, § 4 (West 1987). The plaintiffs, having proved reliance upon PSB's published financial statements, were deemed to have been "actually misled" by PSB at the time they purchased PSB certificates of deposit, and accordingly the trial court ordered that they be allowed to recover all of their deposits. Such recovery violates both of the federal policies implicit in the National Bank Act.

Permitting recovery to the plaintiffs because they could prove reliance upon the financial statements, to the detriment of other uninsured depositors who could not or did not come forward to prove reliance upon PSB financial statements, fails to accord equal treatment to PSB creditors. PSB's deceptive acts could not have reached only the plaintiffs. A congressional committee investigating the failure of PSB found that many financial institutions similarly relied upon financial statements representing PSB's financial integrity.

> Through the final months of Penn Square's existence, and even up to the last day before the bank's doors were closed, in fact, just hours before the doors were closed, many small financial institutions were placing funds in this shopping center bank, reassured by a

Peat, Marwick, Mitchell & Co. audit that some have said gave the bank a "clean bill of health."

So healthy did some find it that they put in sums well above the insured amounts—in many cases running into the millions of dollars from individual institutions. All told, credit unions alone lost $111 million in uninsured funds in Penn Square—over 20 percent of the bank's deposits when it failed.

*Penn Square Bank Failure: Hearings Before the House Comm. on Banking, Finance and Urban Affairs,* 97th Cong., 2d Sess., pt. 2, at 267 (1983) (statement of Rep. St. Germain, committee chairman).

Whether independently analyzing PSB financial statements, or relying upon money brokers who analyzed PSB's financial condition based upon the information contained in those statements, financial institutions other than the plaintiffs undoubtedly placed similar trust in PSB's misrepresented financial condition in assessing their risk of future loss.[8] *See id.* at 271. The National Bank Act precludes these depositors from being treated differently. *Cf. Beacon Mfg. Co. v. Hood,* 204 N.C. 349, 168 S.E. 523, 524 (1933) (reaching identical result under state law in denying depositor's claim for preference in state bank assets). "[I]t is clear that other depositors as to deposits made during this period are entitled in equity to the same relief as [the party seeking a constructive trust], and in granting relief the court should see that their rights are protected." *Standard Oil*

*Co.,* 80 F.2d at 161. "In the absence of a false and fraudulent representation made specifically to the plaintiff, with respect to the financial condition of the [bank], the plaintiff has no equity superior to the rights of other depositors or creditors of the [bank], who made deposits in said [bank] in reliance upon the statements published by said [bank]...." *Beacon Mfg.,* 168 S.E. at 524.

Although the plaintiffs contend that we might avoid this unequal treatment by permitting all depositors situated similarly to the plaintiffs to sue as a class to establish constructive trusts, to allow such suits would potentially jeopardize the orderly administration of the receiver's estate that is required by the Act. We do not think that Congress would have intended to deluge the FDIC with the potentially crushing weight of claims for preferences on behalf of all the uninsured depositors who could allege that they relied upon misleading information that was available to all depositors. Allowing such a preference to be based upon a "race of diligence" among creditors would make "the equality promised to them by the [National Bank Act] ... a mere mockery." *First Nat'l Bank v. Colby,* 88 U.S. (21 Wall.) 609, 614, 22 L.Ed. 687 (1875). Any remedy for fraudulent representations that affects, or potentially affects, all creditors belongs to the receiver, who asserts such claims for the benefit of all creditors. *Cf. In re Longhorn Sec. Litig.,* 573 F.Supp. 255, 272 (W.D.Okla.

---

**8.** The plaintiffs argue that no other financial institutions relied upon PSB financial statements in depositing uninsured funds in PSB because, as noted in a report prepared by the FDIC, "[s]ince 1960 about three-fourths of all failed commercial banks and, *until Penn Square Bank,* all failures over $100 million in size have been handled through purchase and assumption transactions (P & As)." FDIC, *Deposit Insurance in a Changing Environment* ch. I, at 6 (1983) (report submitted to Congress pursuant to § 712 of the Garn–St. Germain Depository Institution Act of 1982). "In P & As all deposits (including uninsured deposits) and other liabilities of general creditors are assumed by a new or existing bank. Thus, despite a bank failure, all depositors and other general creditors are made whole in a P & A." *Id.; see id.* ch. III, at 4. According to the FDIC report, the widespread use of P & A

transactions, instead of merely paying off uninsured depositors their pro rata share of the bank's assets, has altered public perceptions of the safety of funds. *Id.* ch. III, at 1. "[T]his growing perception of almost absolute safety of funds in large institutions is having the effect of removing the consideration of bank risk from business decisions." *Id.*

The fact that risk considerations may have been reduced at that time due to the historical pattern of FDIC practices does not mean that risk of failure was completely excluded from the market. The fact that both of the plaintiffs utilized the services of money brokers, who performed some degree of financial analysis on the institutions they represented, and who were responsible for soliciting the deposits of numerous other institutions, clearly shows that the market was not blind to the risk of failure.

1983) (noting "general rule" that "wrongs committed by a bank's officers or directors that injure all depositors and creditors alike create a liability which is an asset of the bank itself and for which only the bank or its receiver may recover"). When all creditors have been similarly harmed, pro rata distribution of the assets in accordance with the mandate of the National Bank Act accomplishes the same result as if all uninsured depositors had brought suit on their own behalf. *Bryant*, 27 F.Supp. at 565.

Accordingly, the order of the district court imposing a constructive trust upon the assets of PSB in favor of the plaintiffs is REVERSED.